In the Matter of the Accounting of TITLE GUARANTEE AND TRUST COMPANY et al., as Trustees under the Will of CORNELIUS J. RYAN, Deceased, and WILLIAM F. BROWN, as Ancillary Executor of MICHAEL G. RYAN, Deceased.

TITLE GUARANTEE AND TRUST COMPANY, Individually and as Surviving Trustee under the Will of CORNELIUS J. RYAN, Deceased, Appellant and Respondent; ELLEN R. LYNCH et al., Respondents and Appellants, and RALPH S. DANIELS, as Guardian and Ancillary Committee of TIMOTHY B. RYAN, an Incompetent Person, Respondent.

Argued November 30, 1942; decided December 2, 1943.

*Nathan L. Miller, Fred L. Gross* and *Joseph V. McKee* for Title Guarantee and Trust Company, appellant and respondent. Appellant was not prohibited by the rule against self-dealing from investing the funds of a single trust in a whole mortgage acquired by it in the regular course of its business of loaning money on bond and mortgage. (Banking Law, § 188, subd. 7, as amd. L. 1917, ch. 385; *Matter of Flint,* 240 App. Div. 217; *Matter of Union Trust Co. [Hoffman],* 219 N. Y. 514; *Matter of Nugent,* 280 N. Y. 505; *Matter of Tuttle,* 162 Misc. 286; *Johnson* v. *United States,* 163 F. 30; *Flynn* v. *Prudential Ins. Co.,* 207 N. Y. 315; *Lau Ow Bew* v. *United States,* 144 U. S. 47; *Surace* v. *Danna,* 248 N. Y. 18; *Haggar Co.* v. *Helvering,* 308 U. S. 389; *Matter of Hufnagel,* 258 App. Div. 1088.) Even under the construction of the statute, as adopted by the courts below, an investment by a corporate trustee in a whole mortgage could be, at most, only partly illegal because a corporate trustee concededly could legally invest in a part of a whole mortgage. The Surrogate erred in holding that the interrelations between the two corporations were so close that there did not exist between them that independence of operation which alone would have validated a purchase of investments for those trusts from Bond & Mortgage Guarantee Company. (*Majestic Co.* v. *Orpheum Cir-*

cuit, 21 F. 2d 720; *Klein* v. *Board of Tax Supervisors,* 282 U. S. 19; *Berkey* v. *Third Ave. Ry. Co.,* 244 N. Y. 84; *Salvin* v. *Myles Realty Co.,* 227 N. Y. 51; *Jenkins* v. *Moyse,* 254 N. Y. 319; *Halsted* v. *Globe Indemnity Co.,* 258 N. Y. 176; *Rapid Transit Subway Constr. Co.* v. *City of New York,* 259 N. Y. 472; *Matter of Lawyers Mortgage Co.* [*8718 Ridge Blvd.*], 284 N. Y. 371.) The Surrogate erred as a matter of law in holding that in the typical case described no transfer of title to the mortgage was made in fact to Bond & Mortgage Guarantee Company and that the actual transfer was one made directly by the corporate trustee to the trust. (*Matter of Kramer,* 172 Misc. 598; *Matter of Tuttle,* 162 Misc. 286; *Lynch* v. *Gibson,* 254 App. Div. 47, 279 N. Y. 634.) The beneficiaries had full knowledge of the practice now complained of and definitely acquiesced therein. (*Matter of Schoenewerg,* 160 Misc. 819, 277 N. Y. 424; *Giles D. M. Co.* v. *Klauder-Weldon D. M. Co.,* 233 N. Y. 470; *Matter of Packard,* 146 Misc. 65; *Matter of Blodgett,* 171 Misc. 596; *Matter of Salomon,* 175 Misc. 264; *Cox* v. *Pearce,* 112 N. Y. 637; *Ellis* v. *Horrman,* 90 N. Y. 466; *Seger* v. *Farmers' L. & T. Co.,* 187 N. Y. 314; *Fidelity & Deposit Co.* v. *Queens Co. Trust Co.,* 226 N. Y. 225; *Butterfield* v. *Cowing,* 112 N. Y. 486; *Matter of Kern,* 159 Misc. 682; *Fidelity & Deposit Co.* v. *Queens Co. Trust Co.,* 226 N. Y. 225.) The Surrogate erred in vacating prior accounting decrees. (*Schuylkill Fuel Corp.* v. *B. & C. Nieberg R. Corp.,* 250 N. Y. 304.) The Surrogate erred in ruling that proper and timely notice of the investment in certain mortgage certificates had not been given to the beneficiaries, as required by former section 188 of the Banking Law as amended in 1917. (*Barry* v. *Lambert,* 98 N. Y. 300; *Matter of Union Trust Co.* [*Hoffman*], 219 N. Y. 514; *Matter of Smith,* 279 N. Y. 479; *New York Trust Co.* v. *Black,* 178 App. Div. 4, 223 N. Y. 703; *Matter of McCormick,* 40 App. Div. 73.) The notices of investments in participations which the Surrogate sustained as proper and adequate complied with the requirements of the statute. Section 188 of the Banking Law did not prohibit a corporate trustee from allocating to its own trusts a part interest in a mortgage which was not acquired with the express intention of making such allocation. (*Matter of Nugent,* 280 N. Y. 505; *Matter of Dalsimer,* 160 Misc. 906; *Matter of Rosenthal,* 263 App. Div. 873.)

*William W. Owens* and *Nicholas P. Callaghan* for Ellen R. Lynch et al., respondents and appellants. The sale of mortgage participations by the corporate trustee to the trusts was illegal because the trustee had not acquired the mortgages with the intention of participating them among its trust estates but used the trusts as outlets for its own merchandise. (*Matter of Young,* 249 App. Div. 495; *Matter of Schmidt,* 163 Misc. 156; *Matter of Kramer,* 172 Misc. 598; *Matter of Peene,* 155 Misc. 155; *Barry* v. *Lambert,* 98 N. Y. 300; *Matter of Union Trust Co.* [*Hoffman*], 86 Misc. 392, 219 N. Y. 514; *Matter of Nugent,* 280 N. Y. 505; *Matter of Flint,* 240 App. Div. 217; *Matter of Dalsimer,* 160 Misc. 906; *Matter of Tuttle,* 162 Misc. 286; *Matter of Thomson,* 135 Misc. 62.) The corporate trustee should have been surcharged with all investments in part interests in mortgages because it failed to disclose to the beneficiaries that it had purchased the participations from itself. The corporate trustee was properly surcharged for selling its own mortgages to the trusts. (American Law Institute, Restatement of Law of Trusts, § 170; 2 Scott on Trusts 878; *Kelly* v. *First Minneapolis Trust Company,* 178 Minn. 215; *Matter of Long Island L. & T. Co.,* 92 App. Div. 1, 179 N. Y. 520; *Matter of Roche,* 245 App. Div. 192; *Matter of Baker,* 249 App. Div. 265; *Matter of Young,* 249 App. Div. 495, 274 N. Y. 543; *Matter of Peck,* 152 Misc. 315; *Matter of Tuttle,* 162 Misc. 286; *Matter of Schmidt,* 163 Misc. 156; *Meinhard* v. *Salmon,* 249 N. Y. 458; *Matter of Nugent,* 280 N. Y. 505; *Matter of Baker,* 249 App. Div. 265; *Seligman* v. *Friedlander,* 199 N. Y. 373; *Woollcott* v. *Shubert,* 217 N. Y. 212; *Matter of Fischer,* 261 App. Div. 252.) The corporate trustee was properly surcharged for purchasing mortgages from the Bond & Mortgage Company. (*Baxter* v. *Trust & Savings Bank,* 273 Mich. 642; *Matter of Hufnagel,* 258 App. Div. 1088, 259 App. Div. 833; *Wendt* v. *Fischer,* 243 N. Y. 439.) The lower courts properly surcharged the corporate trustee where it failed to advise the beneficiaries that it had invested in a part interest in a mortgage. (*Matter of Roche,* 245 App. Div. 192; *Matter of Dimond,* 163 Misc. 611; *Matter of Peene,* 155 Misc. 155; *Matter of Jones,* 155 Misc. 315; *Matter of Bearns,* 251 App. Div. 222, 276 N. Y. 590.) The beneficiaries had no notice or knowledge of the self-dealing or of the profits made by the corporate trustee at the expense of the trusts and

therefore cannot be deemed to have acquiesced therein. (*Matter of Rennert*, 115 Misc. 762; *Matter of McIntyre*, 159 Misc. 351; *Matter of Brewster*, 92 Misc. 339; *Smith* v. *Howlett*, 29 App. Div. 182; *Adair* v. *Brimmer*, 74 N. Y. 539; *Wendt* v. *Fischer*, 243 N. Y. 439; *Matter of Long Island L. & T. Co.*, 92 App. Div. 1; *Gould* v. *Gould*, 126 Misc. 54; *Matter of Young*, 249 App. Div. 495; *Matter of Rosenberg*, 165 Misc. 92; *Matter of Kinnear*, 148 Misc. 892, 241 App. Div. 893; *Bruff* v. *Rochester Trust & Safe Deposit Co.*, 125 Misc. 579; *Gates* v. *Plainfield Trust Co.*, 121 N. J. Eq. 460; *Matter of Shaw*, 122 N. J. Eq. 536.) The lower court had the power to reopen the earlier decrees where self-dealing had not been disclosed. (*Matter of Long Island L. & T. Co.*, 92 App. Div. 1, 179 N. Y. 520; *Matter of Denbosky*, 245 App. Div. 93; *Matter of Schmidt*, 163 Misc. 610; *Matter of Peck*, 152 Misc. 315; *Matter of McIntyre*, 159 Misc. 351; *Matter of Rennert*, 115 Misc. 762.)

*Herman Kahn* and *Arthur Rosenbaum* for Alice R. Barry et al., respondents and appellants. All the investments which the trustees made in participation certificates for the trusts of the appellants Barry and Hulswit were invalid because no notification was given of the fact that such investment has been made, in some instances not at all, and in the other instances inadequately, and not promptly, all in violation of the statute. (Banking Law, § 188, subd. 7, L. 1917, ch. 385.) The proof on the subject of the whole mortgages, upon which the issue of self-dealing is principally based, compelled the findings of fact of the Surrogate that these mortgages were owned by the Title Company personally, at the time they were being considered and selected by the trust officer and the trust committee of that company for purchase for the trusts, and that the sale which then followed was by that company to the trusts—and not to the Bond & Mortgage Company, despite the routing of the transfer of title thereafter through the latter by means of the double assignments. There was no proof that the trustees purchased the whole mortgages from the Bond & Mortgage Company and not from itself personally. (*Hazzard* v. *Chase Nat. Bank of New York*, 159 Misc. 57, 257 App. Div. 950, 282 N. Y. 652; *Browning* v. *Fidelity Trust Co.*, 250 F. 231, 248 U. S. 564.) That there was self-dealing, as a matter of fact, in respect of the whole mortgages, was further sustained by the proof con-

cerning the close and interlocking relationship between the Title Company and the Bond & Mortgage Company. (*Matter of Tuttle,* 162 Misc. 286.) The purchase of the whole mortgages by the trustees was properly held to be illegal self-dealing, and the courts below properly surcharged the appellant therefor. (*Munson* v. *S. G. & C. R. R. Co.,* 103 N. Y. 58; *Wendt* v. *Fischer,* 243 N. Y. 439; *Matter of Long Island L. & T. Co.,* 179 N. Y. 520; Restatement of Law of Trusts, § 170.) The respondents Barry and Hulswit did not have knowledge of the trustee's self-dealing in the whole mortgages, nor of any of the other matters under criticism, and did not acquiesce therein. The respondents were therefore not estopped from interposing their objections to the investments, in the present accounting. (*Wendt* v. *Fischer,* 243 N. Y. 439; *Adair* v. *Brimmer,* 74 N. Y. 539; *Callahan* v. *Switchmen's Union,* 189 App. Div. 5; *Matter of Tuttle,* 162 Misc. 286; *Matter of Long Island L. & T. Co.,* 92 App. Div. 1, 179 N. Y. 520.) The action of the Surrogate, in vacating the decrees upon the two former accountings, was the just and reasonable exercise of his discretion in the matter.

*Chester B. McLaughlin* and *Frank H. Foley* for Ralph S. Daniels, as guardian and ancillary committee, respondent. During the period in issue the corporate trustee was prohibited from purchasing whole mortgages from itself. The whole mortgages which were assigned by the corporate trustee to Bond & Mortgage and reassigned by the latter to the trustees on the same day, were purchased by the corporate trustee from itself within the prohibition of the rule against self-dealing. (2 Scott on Trusts, §§ 170.12, 170.13; Pomeroy's Equity Jurisprudence, 3rd ed., §§ 958, 1049, 1077, 1078; 3 Bogert, Trusts and Trustees, § 543; Restatement of Law of Trusts, § 170; *Munson* v. *S. G. & C. R. R. Co.,* 103 N. Y. 58; *Matter of Baker,* 249 App. Div. 265; *Matter of Young,* 249 App. Div. 495, 274 N. Y. 543; *Matter of Long Island L. & T. Co.,* 92 App. Div. 1, 179 N. Y. 520; *Matter of Schmidt,* 163 Misc. 156; *Matter of Tuttle,* 162 Misc. 286; *Matter of Peck,* 152 Misc. 315; Personal Property Law, § 21; Decedent Estate Law, § 111.) Subdivision 7 of section 188 of the Banking Law was not intended to permit the sale by a corporate trustee to a trust of whole mortgages belonging to itself. (*Matter of Nugent,* 254 App. Div. 663, 280 N. Y. 505; *Matter of Union Trust Co.* [*Hoffman*], 219 N. Y. 514; *Matter of Peene,* 155 Misc.

155; *Matter of Flint*, 240 App. Div. 217; *Matter of Young*, 249 App. Div. 495, 274 N. Y. 543; *Matter of Balfe*, 152 Misc. 739, 245 App. Div. 22; *Matter of Roche*, 245 App. Div. 192; *Matter of Tuttle*, 162 Misc. 286; *Matter of Peck*, 152 Misc. 315.) The whole mortgages which were assigned by the Title Company to the Bond & Mortgage Company and reassigned to the trustees on the same day were purchased by the corporate trustee from itself within the prohibition of the rule against self-dealing. The Surrogate correctly held that the corporate trustee should be surcharged with the amount of the investment made for the Timothy Burke Ryan trust in the Bernstein mortgage which was sold by the Bond & Mortgage Company to the trust because of the close relationship between the latter and the corporate trustee. (*Matter of Hufnagel*, 258 App. Div. 1088.) The Surrogate correctly held that proper and timely notice of investments in certain mortgage certificates acquired for the Timothy B. Ryan trust had not been given as required by section 188, subdivision 7, of the Banking Law. (*Matter of Heermance*, 254 App. Div. 685, 278 N. Y. 601; *Matter of Bearns*, 251 App. Div. 222, 276 N. Y. 590; *Matter of Gerbereux*, 249 App. Div. 751, 274 N. Y. 495; *Matter of Dimond*, 163 Misc. 611; *Matter of Peene*, 155 Misc. 155; *Matter of Roche*, 245 App. Div. 192; *Matter of Jones*, 155 Misc. 315; *Matter of Nugent*, 280 N. Y. 505.) The Surrogate did not err in vacating the earlier decrees to the extent necessary to permit the objections to be entertained and sustained. (*Matter of Long Island L. & T. Co.*, 92 App. Div. 1, 179 N. Y. 520; *Matter of Denbosky*, 245 App. Div. 93; *Matter of Schmidt*, 163 Misc. 156, *Matter of Adler*, 164 Misc. 544; *Matter of Busto*, 173 Misc. 25.) The documents delivered to Ryan's attorney when he attained his majority did not constitute a disclosure of self-dealing. (*Wendt* v. *Fischer*, 243 N. Y. 439.) There can be no ratification where a beneficiary is not fully apprised of the facts to be ratified, and is left without knowledge of the acts to be affirmed or of his rights under the law applicable and how the acts subsequently complained of would be dealt with by a court of equity. (*Adair* v. *Brimmer*, 74 N. Y. 539; *Matter of Young*, 249 App. Div. 495; *Matter of Cady*, 211 App. Div. 373; *Matter of Long Island L. & T. Co.*, 92 App. Div. 1, 179 N. Y. 520; *Smith* v. *Howlett*, 29 App. Div. 182; *Matter of Robertson*, 165 Misc.

710.) The release may not be construed as a ratification of the acts of the trustee during the infancy of the beneficiary unless it was executed with full knowledge of the acts to be ratified or the faults to be excused. (*Matter of Tuttle,* 162 Misc. 286; *Matter of McIntyre,* 159 Misc. 351; *Matter of Peck,* 152 Misc. 315; *Matter of Kinnear,* 148 Misc. 892, 241 App. Div. 893; *Matter of Ungrich,* 115 Misc. 762; *Adair* v. *Brimmer,* 74 N. Y. 539; *Matter of Long Island L. & T. Co.,* 92 App. Div. 1, 179 N. Y. 520; *Matter of Rennert,* 115 Misc. 762; *Bruff* v. *Rochester Trust & Safe Deposit Co.,* 125 Misc. 579.)

CONWAY, J. These are cross appeals by the Title Guarantee and Trust Company individually and as surviving trustee under the last will and testament of Cornelius J. Ryan, deceased, and by five objectant beneficiaries. The facts have been found upon supporting evidence by the learned Surrogate and have been affirmed by the learned Appellate Division. Under our limited jurisdiction that disposes of the facts and leaves to us only the application of rules of law as required by the facts thus established. We shall refer to three points. As to the other points raised we agree with the rulings below or do not reach them because matters of discretion are involved or questions of fact are determined upon supporting evidence. There are other determinations which we have not disturbed because the amount involved in the particular instance is trivial.

The points we shall discuss are argued forcefully upon both sides, due, in part, no doubt, to the amount of money involved and the length of the period covered. The corporate trustee argues that we have here " formerly well-satisfied beneficiaries endeavoring to take advantage of a technical rule against self-purchase " of securities and that their objections are afterthoughts due to the real estate collapse in the years succeeding 1929. Whether or not the beneficiaries are thus motivated is irrelevant. There are broad general rules both of the common law and of statute which trustees are obligated to follow. The common law rules, as will appear from many of the citations in this opinion, are of very long standing. Within those rules there is ample room for the exercise by trustees of wise judgment and discretion. The general rules, however, are rigid ones. Even though over a long period breaches of those rules

have not resulted in loss of safety of investment or of income, the rules continue and operate " as a protection to a large class of persons whose estates, by reason of infancy, infirmity, or other causes, are intrusted to the management of others " (*Ten Eyck* v. *Craig,* [1875] 62 N. Y. 406, 420) and beneficiaries of trusts may point to those rules and insist that the trustee be surcharged when loss of principal or income eventually ensues by reason of the breaches.

On the other hand the trustees of the corporate appellant were men of standing in their communities. In the matter of the surcharges which we shall discuss, there are not questions of bad faith as matters of fact but breaches of duty as matters of law. In a very limited number of instances was bad faith, malice or misuse of trust property found by the Surrogate and there, subordinates were at fault. There has been no appeal from those findings and they are not before us, except incidentally.

With this introduction, we discuss a record running to seven volumes, with many more exhibits than are printed in its four thousand odd pages affecting more than three hundred objections.

Cornelius J. Ryan died a resident of the county of New York on April 20, 1911, leaving a last will and testament which was admitted to probate by the Surrogate of New York County.

The pertinent provisions of the will are those by which the testator gave the residue of his estate to his children, all six of whom are now living and are the objectants in this proceeding. The testator provided that the share of each child living at his death and then under thirty-five years of age should be retained and held by the trustees named in the will until such child reached the age of thirty-five years, the income to be applied meanwhile to the education, support and maintenance of such child. The principal of the trust was then to be turned over to him.

Alice J. Ryan, the widow, was appointed executrix by the will and letters testamentary were issued to her on May 25, 1911.

Under the provisions of the will, the widow was also appointed trustee of the trusts, together with such trust company as she might select. She selected the Title Guarantee and Trust Company (hereinafter referred to as T G & T or as the corporate

or appellant trustee) to act as her cotrustee and the selection was approved by the Surrogate in 1911.

The will further provided that Michael G. Ryan and William F. Brown should act as cotrustees with T G & T upon the death of the widow. She died in October, 1912, and in March of 1913 William F. Brown qualified as trustee as did Michael G. Ryan in June of 1914. Michael G. Ryan died at Los Angeles in 1928 and ancillary letters testamentary on his estate were issued to William F. Brown. The latter died in 1942 subsequent to the argument of the appeal in the Appellate Division. No successor trustee has been appointed. The T G & T is therefore the sole surviving trustee.

The investments because of which the appellant trustee has been surcharged were in what we shall call whole mortgages or in apportioned part interests in bonds and mortgages. We shall consider first the matter of whole mortgages in connection with the question whether a trust company in this State might lawfully sell, between the years 1917 and 1936, its own mortgages to its trusts. As the appellant trustee phrases it: '' The appellant was not prohibited by the rule against self-dealing from investing the funds of a single trust in a whole mortgage acquired by it in the regular course of its business of loaning money on bond and mortgage.'' The decision of that question, which must be to the contrary of the trustee's contention, is inextricably connected with the question of equal weight and importance, whether the interrelation between the Bond and Mortgage Guarantee Company and the appellant trustee was so close that in the words of the learned Surrogate '' there did not exist between them that *independence of operation* which alone would have validated a purchase of investments for these trusts from Bond and Mortgage Guaranty Company.''

We shall consider first the facts.

The corporate trustee was incorporated in 1882. It was authorized to receive deposits of money, to loan money on real and personal property, to act as trustee '' and to guarantee bonds and mortgages and titles to real estate.'' Its first business activities consisted of searching titles and insuring titles to real property. About 1888 it began making mortgage loans. About 1892 it established a trust department and did a limited banking business. It never guaranteed the payment of mort-

gages but conducted an extensive business in making mortgage loans and examining and guaranteeing titles to real estate. Ten years after its organization, in 1892, the Bond and Mortgage Guarantee Company (hereinafter referred to as B & M) was incorporated under Laws of 1885, chapter 538, " to examine and guarantee bonds and mortgages and titles to real estate." It thus had power similar in important respects to T G & T, but B & M did not guarantee titles. Its business consisted in making mortgage loans and selling mortgages with a guaranty of payment of principal and interest.

When B & M was organized it was planned by T G & T, as shown by its minutes, to offer two-thirds of the stock to the then stockholders of T G & T. Whether or not that plan was carried out does not appear. During the first few years of its existence B & M did not pay rent or clerk hire to the corporate trustee for premises occupied by it or clerks used except to the extent that it paid a lump sum for services furnished or rendered. Later it paid rent to the corporate trustee for space occupied in Manhattan and Brooklyn in property owned by the latter but it was *not charged for telephone service furnished, until 1931.*

From 1910 to 1933 arrangements were made by T G & T, and B & M for sharing expenses of some departments in Manhattan. In Brooklyn B & M had its own staff except that at least the expenses of the sales department were divided equally between the two corporations. Among the departments as to which expenses were shared in Manhattan were: stenographic, auditing (in part), sales and appraisal.

From the 1920's to 1933 the corporate trustee had branch offices in midtown Manhattan, in the Bronx, on Staten Island and in Jamaica, Long Island City, Mineola, and Riverhead. In the Staten Island and Jamaica offices there were salesmen and appraisers who were joint employees of both T G & T and B & M. In Long Island City there were one or more salesmen who were joint employees. There were joint employees in the midtown Manhattan and the Bronx office. The corporate trustee never charged B & M for rent, light or taxes in its offices other than in the downtown Manhattan and the Brooklyn offices.

During part of the period covered by the present accounting the president of T G & T was the president of B & M. The Chairman of the Board of T G & T was the Chairman of the Board of B & M. The executive vice-president of T G & T was, for part of the time, vice-president of B & M. He was also a trustee of T G & T and a director of B & M. Another vice-president of T G & T from 1923 to 1937 was, from 1923 to 1933, an officer of B & M and for part of that time, a director. An assistant vice-president of T G & T from 1927 until he retired was assistant secretary of B & M and sales manager for both companies in the downtown New York office. For many years prior to 1933, when B & M went into rehabilitation, the same man had been comptroller of both companies; another man had been auditor of both companies; another man had been real estate officer for both companies.

For the past forty years the main office of the T G & T in Manhattan has been at 176 Broadway. Until 1933 the B & M offices were in the same building. About twenty years ago a building was erected around the corner and B & M moved into that. It added an " L " to 176 Broadway. The newly erected building could be entered from 176 Broadway. There was no doorway between the two buildings, merely a large open space, until 1932 or 1933. In Brooklyn both companies together occupied an entire building. The building ran through from Remsen Street to Montague Street. B & M was on the fifth floor of the Remsen Street building. The name of each company was lettered on the entrance to the buildings both in Brooklyn and Manhattan.

The B & M books were audited to some degree by T G & T. B & M's by-laws so provided.

B & M kept its most active bank account with T G & T. T G & T frequently made open loans to B & M when it needed cash for monthly interest payments, and the companies sold mortgages to one another from time to time, depending upon their respective cash needs.

The real estate appraisal departments, were generally operated by both companies jointly, in the sense that some appraisers were on both payrolls and the appraisals of either company were at the disposal of the other. Some of the trustees of T G & T were members of the B & M Mortgage Committee and

some of the directors of B & M were members of the T G & T's Mortgage Committee. The committees of both companies at times sat and acted as a single group.

Office supplies were bought jointly and the cost shared in and after 1931. In 1933 the companies jointly announced a wage reduction. In its minutes in 1933 T G & T recited that it and B & M " have for many years maintained close working arrangements to the *mutual advantage of each Company*".

In later years numerous advertisements appeared in New York City newspapers in which the names of both companies were mentioned. The companies sometimes advertised jointly and shared the expense. For example, an advertisement appeared in New York (in 1930) referring to the capital funds of $34,000,000 of T G & T and $20,000,000 of B & M. The public was advised that " this scientific use of the combined fund of $54,000,000 provides the highest degree of protection procurable." In the same month the trustee advertised, under the title " In Union There is Strength ": " The Title Guarantee and Trust Company and the Bond and Mortgage Guarantee Company are *associated* to the advantage of borrowers and lenders in the vicinity of Greater New York." Other joint advertising contained such expressions as: " Mortgages with Something Behind Them " and " A Strong Combination ". Those advertisements were published with the authority of the officers of the corporate trustee.

Letters were sent to prospective investors by T G & T calling attention to mortgages " guaranteed by our *associate* Company, the Bond and Mortgage Guarantee Company " and reciting that " * * * the holders of our guaranteed First Mortgages and Guaranteed First Mortgage Certificates have enjoyed peace of mind because they * * * knew that return of the principal in full was guaranteed by our *allied* Company, Bond and Mortgage Guarantee Company."

It was the established practice of the trust officer of the trustee to buy for the six Ryan beneficiaries only mortgages guaranteed by B & M. The trust officer, when there were trust funds to invest would call upon the Sales Division of B & M to supply him with a list of available mortgage investments. The B & M sales manager would then supply him with the " offering sheets " of mortgages available for purchase. T G

& T regularly supplied to B & M a list of mortgages owned by the former and B & M would sell from that list to investors desiring to purchase guaranteed mortgages. The trust officer testified that he did not know at the time he made his selections of mortgages for investment for the trusts whether or not they were then owned by the corporate trustee or by B & M. He would select from such list of mortgages furnished him by B & M mortgages in the approximate amount which he desired to invest. In making an investment he relied principally upon the guarantee of the B & M; he never inquired whether the property, if a multiple dwelling or stores, or other commercial property was earning enough to justify the investment; he never inquired as to the previous history of the mortgage and never inquired whether the mortgage was in arrears. We may sum up by saying that the trust officer testified he made the investments relying upon the guaranty of the B & M. Once the investment was made the corporate trustee paid little attention to it insofar as the payment by the mortgagor of interest and taxes or insofar as renewal negotiations were concerned. So long as B & M paid an amount equivalent to the interest contracted for in its policy of guaranty no inquiry was made as to whether or not the owner had paid interest or taxes.

As to whole mortgages we have seen (*supra*) that the trust officer, when he received the list from the Sales Division of B & M showing mortgages available for purchase or investment, did not know whether T G & T or B & M was then the owner of the security. Apparently it was of no moment to him. The appellant trustee in its brief outlines the procedure as follows: "If ownership of the mortgage chosen by the trust officer was in the B & M, then upon delivery of the trustee's check in payment of the purchase price, the sale and assignment was made between the B & M and the trustees. If, however, title to the mortgage at the moment happened to be in the T G & T, B & M asked for and got an assignment of the mortgage from the T G & T and then assigned it to the Ryan trustees, the assignments usually being made on the same day." In other words, B & M asked for an assignment from T G & T individually and reassigned to T G & T as trustee under the Ryan will on the same day as a part of one transaction.

The selection by the trust officer of the corporate trustee of whole mortgages owned by the *trustee individually* for purchase by the Ryan trusts occurred in a large number of cases. Thus in the Barry trust it occurred as to all of the whole mortgages. In the Hulswit trust it occurred as to all of the whole mortgages. In the trust represented by Daniels, as guardian and ancillary committee, it occurred as to all but one mortgage for $2,750 which had been sold by T G & T to a third person and taken by assignment one month before it became due by B & M, extended and sold to the trust. In the Lynch, Kearney and C. J. Ryan trusts it occurred as to all but eight mortgages. Those eight mortgages had been sold by T G & T to third parties some years earlier and had been subsequently acquired by B & M by assignment or through foreclosure.

Thus we have all but nine of the whole mortgages in the trusts under the Ryan will selected for purchase by the trust officer of the corporate trustee for the trusts at times when those mortgages were owned by the trustee in its individual capacity. Concededly, the method of procedure was as to each of those mortgages the same as that followed as to the Rothschild mortgage. As to that the Surrogate found: " In respect of a so-called Rothschild mortgage a trustees' check dated March 28, 1932, for $5,500 to the order of Bond and Mortgage Guaranty Company was put in evidence. The cash book of Bond and Mortgage Guaranty Company was examined and the supposed payment of this sum to Bond and Mortgage Guaranty Company was not found recorded among the cash receipts of that company. It was conceded by the accounting corporate trustee that this check was not deposited at all by Bond and Mortgage Guaranty Company, but was endorsed over to Title Guarantee and Trust Company which collected the proceeds. The records of Bond and Mortgage Guaranty Company in respect of investments made by it were examined and such examination disclosed that no entry was made in its records of the acquisition of a Rothschild mortgage. An officer of the Title Guarantee and Trust Company was then asked to produce the cash book of the corporate trustee (which concededly had been the original owner of the $5,500 Rothschild mortgage) and he was asked to show the record of the sale of that mortgage to Bond and Mortgage Guaranty Company. He stated that the

cash book of Title Guarantee and Trust Company showed no receipt from Bond and Mortgage Guaranty Company of any payment for that mortgage by Bond and Mortgage Guaranty Company. When asked to exhibit the entry in the corporate trustee's books respecting the receipt of money for this mortgage *from any source* he testified that the only entry on the subject was as follows: 'Mortgage No. 370304, Title Co., Ryan-Rothschild, $5,500.' Thus the proof showed that the only actual transfer of money was a transfer of money out of the Ryan trust estate (the trust for Barry) to Title Guarantee and Trust Company. No money ever went into Bond and Mortgage Guaranty Company's funds from the trust. The transfer of the mortgage was a transfer from the corporate trustee in its corporate character to the trust of which it was trustee. The method of transfer of funds just outlined and the lack of entries either of cash receipts or of purchase of the Rothschild mortgage in the books of Bond and Mortgage Guaranty Company are conceded to be typical of the handling of the whole mortgage investments in the trusts."

The explanation of the corporate trustee is: " In the cashier's department of the T G & T there were, every day, as a matter of fact, items to be cleared between the two companies. A list of those was kept and a net check, somewhat similar to bank clearings, was drawn to the debtor or creditor at the end of the day. They likewise frequently endorsed checks to each other, more frequently by the B & M to the T G & T because that was its depositary, and in the exchange of funds those checks were endorsed. *They did not go through any bank account of the B & M*. At the end of the day they would match checks against checks, totals against totals. * * * the totals of the charges against each company were compared and ' whoever owed whom, then made a check ' * * *

" Inasmuch as the check for the payment of the mortgage represented a net transaction there was no necessity for entry on the books of the B. & M except on the daily sheet."

The daily sheets were not available at the trial having been destroyed long prior thereto. However, there was no direct testimony that the Rothschild check or any of the other checks figured in any such day sheet adjustment.

The corporate trustee urges that the learned Surrogate brushed aside the realities when he found that no money went into the funds of B & M from the trust. However, it was a finding of fact. We cannot say as a matter of law that the contrary is the fact. Certainly, both the finding and the explanation disclose further the interrelation and the interdependency of B & M and the corporate trustee.

So much for the facts on that phase of the controversy. We now turn to the legal question presented, as to whether an amendment in 1917 to Banking Law, section 188, subdivision 7, changed the common law rule as to self-dealing so as to permit a trust company to sell whole mortgages to itself as trustee. We use the words " trust company " because the amendment applied only to trust companies and not to other corporate trustees.

We shall therefore, now consider the applicable law as to (1) the whole mortgages which the learned Surrogate found to have been " routed " through B & M by the trustee in its individual capacity to itself as trustee as indicated and (2) the whole mortgages (nine in number as indicated *supra*) which happened to be in the name of B & M at the time of their selection as a medium of investment for the beneficiaries T. B. Ryan, Lynch, Kearney and C. J. Ryan by the trust officer of the corporate trustee.

It seems hardly necessary to cite authorities in support of the settled rule of law that a trustee may not sell its own property to a trust nor mingle its own funds with those of a trust. That rule applies equally to corporate as well as individual trustees except as changed by statute. (American Law Institute, Restatement of the Law of Trusts, § 170; *Doud* v. *Holmes*, 63 N. Y. 635; *Matter of Long Island Loan & Trust Co.*, [1904] 92 App. Div. 1, 4, affd. on opinion below 179 N. Y. 520; *Matter of Union Trust Co.* [*Hoffman*], [1916] 219 N. Y. 514; *Matter of Young*, [1937] 249 App. Div. 495, 500, affd. 274 N. Y. 543; in *Matter of Nugent*, [1939] 254 App. Div. 663, affd. 280 N. Y. 505, the question of self-dealing by the trustee was not raised and all questions of fact had been resolved against the objectants.) The statement in *Matter of Union Trust Co.* (*Hoffman*), *supra*, at page 521: " there is no difference between a corporate trustee and an individual trustee in its or his duty in

respect to investments '' was equally applicable before its pronouncement as afterwards. The pertinent portion of the predecessor section to Banking Law, section 188, subdivision 7, enacted in chapter 696 of the Laws of 1893, read as follows: '' All investments of money received by any such corporation in either of such characters (including that of trustee) shall be at its sole risk, and for all losses of such money the capital stock, property and effects of the corporation shall be absolutely liable, unless the investments are such as the courts recognize as proper when made by an individual acting as trustee, * * * or such as are permitted in and by the instrument or words creating or defining the trust.'' (Portion in parenthesis supplied.) That statute expressing the identity of the obligations of trust company and natural person trustees continued in practically identical form until its amendment in 1917, to which further reference will be made. It merely was a statutory substitution of a trust company's assets for '' the ordinary requirement of an individual trustee in respect of a bond.'' (*Matter of Flint,* 240 App. Div. 217, 224, affd. 266 N. Y. 607.)

In *Matter of Union Trust Co.* (*Hoffman*) (*supra*), the corporate trustee had purchased whole mortgages solely for the purpose of distributing or allocating part interests therein among certain of its trusts and did so upon completing the purchase. In its records it made a written declaration of trust for *each of the participating trusts* and notified each life tenant at once by letter of the allotment to the trust in which he was interested. Upon an accounting in one of the trusts, the beneficiaries questioned the legality of the transaction. The trust company established that the practice complained of was followed by trust companies generally. The learned Surrogate condemned the practice for a number of reasons, one of which was that the title to the mortgage being in the individual name of the corporate trustee, it could readily be converted if the corporate trustee became financially embarrassed but felt bound to overrule the objection.

Following the affirmance in the Appellate Division without opinion, this court considered the matter at length and in discussing the propriety of commingling trust funds said: '' The trust investments to which objections are made * * * are

investments previously made upon bonds and mortgages taken in the name of the trust company. It has been the practice of the trust company to use the money of *several trusts held by it as trustee,* whether created by one or several instruments, to loan on bonds and mortgages given as security for such loans. It has also been its practice to take such bonds and mortgages in its name and in its own right. The amount of the investment so taken by it in its own right is then *distributed* among the various trusts by *charging* against such trusts on the books of the trust company the amount of money which *it then determines or has determined as a part of the transaction in making the loan to use from each of the several trusts* so combined in making the loan." (p. 517.)

We also said: " The advantages that are frequently to be secured by *combining trust funds* to make a large and more satisfactory investment than can be made of the funds of *one trust without combination* are of sufficient importance and value to the *several trust funds* to overcome any disadvantage that may arise from the fact that the several owners of the investment may thereafter differ in the matter of handling the same. *Trust funds* have been from time to time *combined* for investment with satisfactory results and the practice is generally recognized as proper for a trustee. (11 Ruling Case Law, 143; *Barry* v. *Lambert,* 98 N. Y. 300)."

We criticized the trustee for investing the trust funds in its individual name and not as trustee but affirmed, saying (p. 522): " The order of the Appellate Division affects only transactions which have been reported to the beneficiaries, and for that reason should be affirmed, * * * ."

It is important to note the facts in the *Union Trust Company* case. There the trust company determined as a part of the transaction how much money from *each of several trusts* would be used in making the loan *on behalf of those trusts.* It was a *trust investment for several trusts.* It was not a matter of selling, to a trust, apportionments of or shares in mortgages placed as a matter of business — the business of loaning money on mortgages. It was a matter of making a *trust investment for several trusts* at one time in one mortgage. The question of a sale by a corporate trustee to one of its trusts *was not in issue.* No funds of the Union Trust Company were ever joined in the

investment of the trust funds. When we turn to the findings of fact and the trustee's brief in this court that is made abundantly clear. Point I of its brief was: " The trustee has not made any of these investments for itself and subsequently turned them over to trust estates; *nor has it joined trust moneys with its own in making an investment;* nor has it joined several trust funds in one investment in such a way that they cannot be separated readily and exactly; nor has it lost control over the investment." That was the opposite of the situation disclosed in the instant case.

The decision in the *Union Trust Company* case was rendered December 28, 1916. In March of 1917 the then Chairman of the Senate Committee on Banking introduced a bill which became chapter 385 of Laws of 1917. It *continued* old subdivision 7 of section 188 of the Banking Law, as enacted by Laws of 1914, chapter 369, which read as follows:

" Investments. All investments of money received by any such corporation, and by any trust company chartered by special act, prior to May eighteen, eighteen hundred and ninety-two, as executor, * * * or testamentary trustee, * * * shall be at its sole risk, and for all losses of such money the capital stock, property and effects of the corporation shall be absolutely liable, unless the investments are such as are proper when made by an individual acting as trustee, executor, *. * * or such as are permitted in and by the instrument or words creating or defining the trust ", but *added* the following:

" Investments in bond and mortgage by any such corporation as * * * personal or testamentary trustee, * * * may be made by *apportioning* to any estate or fund held by such corporation in any of such capacities *a part interest* in a bond and mortgage *held by or in the name of such corporation,* individually or in any representative capacity, and any such part interest may be repurchased at its face value by such corporation individually or in any representative capacity; *but* such bond and mortgage shall be a legal investment for trustees under the laws of this state and the records of such corporation shall at all times show every interest in the said bond and mortgage and any part interest in such bond and mortgage so apportioned shall at all times be and remain at least equal in lien to any other interest therein and *such corporation shall promptly notify*

*each person of full age and sound mind entitled to the income
therefrom of the fact that such investment has been made.
\* \* \*."* (Emphasis supplied.)

It is the very cornerstone of the argument of the appellant
trustee and one to which it returns again and again, that by that
addition to the former section 188, subdivision 7, the Legislature
in 1917 permitted a trust company to sell whole mortgages to
itself as trustee and not merely to apportion parts of them, and
that such permission was so accorded until 1936 when the
*addition* to section 188, subdivision 7, made by Laws of 1917,
chapter 385, was repealed and the following enactment substi-
tuted by Laws of 1936, chapter 898:

" But no corporate fiduciary shall purchase securities from
itself. On and after this act takes effect no such corporation
shall invest in any part interest in a bond and mortgage on
behalf of any estate or fund held by such corporation as execu-
tor, \* \* \* personal or testamentary trustee, \* \* \*.
Any such part interest in a bond and mortgage heretofore
apportioned to any estate or fund and held by such corporation
as \* \* \* personal or testamentary trustee \* \* \* and
outstanding at any time in the hands of any estate, fund or
person may be repurchased at its face value by such corporation
individually. \* \* \* It is the intent of this act to prohibit
after August thirty-first, nineteen hundred thirty-six any
future apportionments or investments of any part interests in
bonds and mortgages to or investments in part interests of
bonds and mortgages for any estate or fund of which such
corporation is executor, \* \* \* personal or testamentary
trustee, \* \* \*."

The appellant trustee argues that to say that the addition or
amendment to section 188, subdivision 7, in 1917 merely permit-
ted the apportioning of parts of mortgages held by or in the
name of a trust company and continued the prohibition against
the sale of whole mortgages by a trust company to itself as
trustee is to defy logic and common sense; that while the statute
permitted the *apportionment* of *parts* of bonds and mortgages
in terms, the Legislature did not intend trust companies or the
courts to follow those terms because so to do would result in the
unreasonable holding that a trust company could apportion to
itself as trustee a 99% part of a bond and mortgage held by it
or in its name and yet it could not properly sell 100% of that

bond and mortgage to itself as trustee. It further argues that its construction of legislative intent in the 1917 amendment is shown to be correct by (1) an examination of Personal Property Law, section 21, and Decedent Estate Law, section 111, as they were prior to their amendment in 1918 and as amended in that year (dealing generally with the investment powers of trustees, [see *infra*, p. 402]) and (2) by the first sentence of the amendment to section 188, subdivision 7, in 1936, as quoted (*supra*) reading " But no corporate fiduciary shall purchase securities from itself."

This argument necessitates a consideration of the case of *Union Trust Company* (*supra*) and the amendments to the three statutes, to which reference has been made, in their relation one to another, since we think that that relation has been misapprehended.

*Matter of Union Trust Co.* (*Hoffman*) (*supra*) was decided in 1916. In it this court implicitly reaffirmed its previous decisions that a trustee could not deal with itself as to trust property but followed prior decisions permitting a trustee " to combine several trust funds in an investment in a single bond and mortgage, held by the trustee *in its own name,* provided that the transaction was carried out in manner there described, which would adequately protect the rights and interests of the beneficiary of the trust fund." (*Matter of Smith* [LEHMAN, J.] 279 N. Y. 479, 484, 485; [Emphasis in original].) From the rule prohibiting self-dealing by a trustee, except as amendments thereto have been made *by statute* beginning in 1917, this court has never deviated but has preserved the " rule of undivided loyalty " against the " disintegrating erosion " of particular exceptions. (*Wendt* v. *Fischer,* 243 N. Y. 439; *Meinhard* v. *Salmon,* 249 N. Y. 458.)

It is contended that the 1917 amendment to section 188, subdivision 7, was a codification of the rule as declared in the *Union Trust Company* case but it is clear from a study of the case and a reading of the amendment that that is not a correct interpretation of the statute. The statute covered an entirely different situation. The *Union Trust Company* case permitted a corporate trustee to *distribute* a mortgage in its *entirety* among several trusts for which it had been purchased, where there had been prompt notification of the distribution to the beneficiaries. That did not cover a situation where a trust company such as

appellant desired to " apportion " to a *single* trust a part interest in a bond and mortgage owned by it and retain in its own portfolio all or part of the balance of that same mortgage. The amendment of 1917 provided for that and permitted self-dealing and mingling of trust funds with its own funds by a trustee as it had never before been permitted. It was a radical departure from the common law as declared in *Doud* v. *Holmes* (63 N. Y. 635); *Matter of Long Island Loan & Trust Co.* (*supra*); *Matter of Union Trust Co.* (*Hoffman*) (*supra*) and must be strictly construed against the favored trustee. " Rules of the common law are to be no further abrogated than the clear import of the language used in the statute absolutely requires. (*Bertles* v. *Nunan*, 92 N. Y. 152, 158.) " (*Transit Commission* v. *Long Island R. R. Co.*, 253 N. Y. 345, 355. Also, *Fitzgerald* v. *Quann*, 109 N. Y. 441; *Seligman* v. *Friedlander*, 199 N. Y. 373; *Woollcott* v. *Shubert*, 217 N. Y. 212; McKinney's Cons. Laws, Book 1, Statutes, § 311.)

While the 1917 amendment was an enabling act, as far as a trust company trustee was concerned (and not as far as *individuals* or *other corporate trustees* were concerned), it did not cover still other situations. For instance, a natural person trustee could not *apportion* a part interest in a bond and mortgage to himself as trustee. No fiduciary, natural or corporate, could make an original " *investment* of trust funds in a certificate of any fractional share, even in a single mortgage * * *." (*Matter of Stupack*, [LEHMAN, J.] 274 N. Y. 198, 210; *Matter of Smith, supra* pp. 484, 485.) A trust company could not sell to itself as trustee a share or part of a bond and mortgage which was *not held by or in its name*. Personal Property Law, section 21, and Decedent Estate Law, section 111 (which latter had been taken in 1909 from former Personal Property Law, § 9), were applicable to both natural and corporate fiduciaries and had been affected only to the extent required by the 1917 amendment to section 188, subdivision 7. " At the same session the Legislature passed a bill which was intended to authorize *all* fiduciaries to invest in ' parts or shares ' of such *mortgages which were not held in the name of the fiduciary.* That bill was vetoed by the Governor, but a similar bill was passed in 1918 and became chapter 544 of the Laws of 1918, amending * * * section 111 of the Decedent Estate Law

and section 21 of the Personal Property Law (Cons. Laws, ch. 41) so as to authorize fiduciaries to make such investments." (*Matter of Stupack, supra,* 208.) (Emphasis supplied.) The amendment permitted *all* fiduciaries to invest " in shares or parts " of bonds and mortgages provided, among other things " that bonds and mortgages in parts of which any fiduciary may invest trust funds together with any guaranties of payment, insurance policies and other instruments and evidences of title relating thereto shall be held for the benefit of such fiduciary and of any other persons interested in such bonds and mortgages by a *trust company* or *title guaranty corporation* organized under the laws of this state, and that a *certificate* setting forth that such corporation holds such instruments for the benefit of such fiduciary and of any other persons who may be interested in such bond and mortgage *among whom the corporation holding such instruments may be included,* be executed by such corporation and delivered to each person who becomes interested in such bond and mortgage." There we have the first use of the word " certificate " in an applicable statute relating to fiduciaries.

The statutory plan was then complete. The appellant trustee here, for instance, could

1. Combine "several trust funds in an investment in a single bond and mortgage, held by the trustee *in its own name,*" and *distribute* under the circumstances and in the manner indicated and outlined in *Matter of Union Trust Co. (Hoffman) (supra)* or

2. It could *invest by apportioning* to a trust of which it was trustee " a part interest in a bond and mortgage held * * * *in the name of such corporation* " (the appellant trustee) in accordance with the 1917 amendment of Banking Law, section 188, subdivision 7, or

3. It could *invest* " *in shares or parts* " of bonds and mortgages which were *not held by it nor in its name* under the 1918 amendments to Personal Property Law, section 21, and Decedent Estate Law, section 111.

A failure to realize the fact that a complete legislative plan was formulated and enacted leads to misapprehension of the amendments and of the necessity for the amendments to Personal Property Law, section 21, and Decedent Estate Law, section 111. Those two sections did not relate only to invest-

ments by natural person trustees as distinguished from corporate trustees. They had always governed *all* fiduciaries. (*Matter· of Stupack, supra,* p. 210; *Matter of Smith, supra,* pp. 484–486.) Before discussing that further, there is another fact which should be noted. The amendment to Banking Law, section 188, subdivision 7, in 1917 did not, as it is claimed, affect " corporate trustees " — it related only to trust company trustees. There were many banking institutions which had power to act as trustees which were not trust companies. They had derived that power either from a general statute or from a special incorporating statute, as had this appellant trustee. In addition all corporations which had a legal capacity to take real or personal property in 1917 could then act as trustee in the absence of a charter or statutory prohibition. (*Vidal* v. *Girard's Executors,* 43 U. S. 127, 187, 188; 2 Kent's Commentaries 14th ed. pp. 280, 281; Ballantine, Manual of Corporation Law and Practice, p. 206; *Sheldon* v. *Chappell,* 47 Hun, 59.) Thus the amendment of 1917 to section 188, subdivision 7, was in reality limited in scope and corporate trustees other than trust companies were still governed by Personal Property Law, section 21, and Decedent Estate Law, section 111, except as modified by their own corporate charters.

To return now to those two statutes. Personal Property Law, section 9, was the predecessor to both and as enacted in 1902 by chapter 295 read as follows: " Investment of trust funds. — An executor, administrator, guardian, trustee or other person holding trust funds for investment may invest the same in the same kind of securities as those in which savings banks of this state are by law authorized to invest the money deposited therein, and the income derived therefrom, and in bonds and mortgages on unincumbered real property in this state worth fifty per centum more than the amount loaned thereon."

It so read in 1904 when *Matter of Long Island Loan & Trust Co.,* (*supra*) was decided forbidding self-dealing by a corporate trustee.

Then in 1907, section 9 was amended to read as follows, by Laws of 1907, chapter 669: " Investment of trust funds. — An executor, administrator, guardian, trustee or other person holding trust funds for investment may invest the same in the same kind of securities as those in which savings banks of this state

are by law authorized to invest the money deposited therein, and the income derived therefrom, and in bonds and mortgages on unincumbered real property in this state worth fifty per centum more than the amount loaned thereon. Any executor, administrator, guardian, trustee or other person holding trust funds may require such personal bonds or guaranties of payment to accompany investments as may seem prudent, and all premiums paid on such guaranties may be charged to or paid out of income, providing that such charge or payment be not more than at the rate of one-half of one per centum per annum on the par value of such investments. But no trustee shall purchase securities hereunder from itself.''

While the added last quoted sentence was but a statutory statement of the common law rule (*Matter of Long Island Loan & Trust Co., supra*), viewed historically and in its context it was no doubt added so that a title guaranty insurance company such as appellant might not sell to itself as trustee, under the new legislative addition ('' hereunder ''), a bond and mortgage, the payment of which had been guaranteed by it, and then collect one-half of one per cent for its guaranty in addition to its commission as trustee. That statutory purpose is made perfectly clear if we take out the period after the word '' investments '' in the next to the last line of the statute as quoted and change the '' B '' in '' But '' to a small instead of a capital letter. By that 1907 amendment recognition was given to the mortgage guaranty business since it permitted fiduciaries to pay stipulated guaranty premiums out of trust income for such guarantees. Only three years before, the Legislature by Laws of 1904, chapter 543, had authorized title guaranty insurance companies to '' guarantee or insure *the payment* of bonds and mortgages.'' The appellant trustee, it is true, had been organized under a special act as the German-American Loan and Trust Company of New York by Laws of 1882, chapter 392 but in that Act in section 9 the corporation had been given the power '' to guarantee bonds and mortgages and titles to real estate.'' That power was continued in the amendatory Laws of 1883, chapter 367, and in the statute Laws of 1884, chapter 167, changing the name of the corporation to Title Guarantee and Trust Company. So that the appellant trustee, incorporated under a special act, B & M, organized under

Laws of 1885, chapter 538, and all title guaranty insurance companies after 1904 had the power to guarantee the payment of bonds and mortgages as the Legislature well knew and the additional sentence (or clause as it was no doubt intended to be) was an advisable if not a necessary restriction on the new grant of power by the 1907 amendment. (See, also, Opinions of Attorney General 1889, p. 339.)

The addition of the same sentence forbidding self-purchase to Banking Law, section 188, subdivision 7, when it was amended in 1936, as indicated (*supra*), was merely a statutory statement of the common law rule as applied in *Matter of Long Island Loan & Trust Co., (supra)*, in 1904, when there was no such provision either in the then applicable sections of the Banking Law or the Personal Property Law (Decedent Estate Law, § 111 had not been then enacted as a companion section to Personal Property Law, § 9. It was first enacted in 1909.) Failure to include such a sentence in the 1917 amendment to the Banking Law, when it was unnecessary, or adding it to the 1936 amendment, when it still was unnecessary, may assuredly not be considered as evidencing a legislative intent in 1917 to thereby confer upon a *trust company trustee* (as distinguished from all other corporate trustees) the power to sell whole mortgages to a trust of which it was trustee when in carefully chosen words and to meet a definite existing situation the Legislature provided for the *apportioning by a trust company* to itself as trustee of a *part interest* in a bond and mortgage held by or in its name.

We have now indicated the reason why T G & T must be surcharged as to the mortgages " routed " through B & M. A similar reason requires that T G & T must also be surcharged as to the nine other whole mortgages, adverted to (*supra*). There was no relaxation as to those mortgages of the fundamental rule of undivided loyalty to a trust nor of the rule that a trustee shall not *place itself* in a position where its interest *may be* in conflict with its duty. It must be said here that the relation between the appellant trustee and B & M was so close and so interdependent that there could not be " undivided loyalty " by the former to the trusts nor independence of operation by either the trustee or B & M when the interest of either was involved. That the appellant trustee had placed itself in a

position where its interest was in conflict with its duty cannot be disputed. As to two investments in two of the trusts, for instance, the appellant trustee extended the time of payment due to its desire to protect B & M at the expense of the trusts. From findings to that effect there has been no appeal.

It is not a question whether the appellant trustee and B & M are separate legal entities. They are. The corporate trustee argues that because the companies "co-operated in certain respects for mutual efficiency and economy which was entirely lawful" there was no merger. We shall concede that. The learned Surrogate, however, found that the assignment by T G & T to B & M and the reassignment on the same day, as a part of one transaction, by B & M to T G & T as trustee, with no evidence of real ownership of the mortgages in B & M, was a transaction made directly between T G & T and T G & T as trustee and that there was no transfer of title to the mortgage to B & M, and we cannot say, on this record, that that finding, supported as it was by evidence, was incorrect as a matter of law. In *Berkey* v. *Third Avenue Ry. Co.* (CARDOZO, J.) (244 N. Y. 84, 95) we said "Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice. (Ballantine, Parent and Subsidiary Corporations, 14 Calif. Law Review, 12, 18, 19, 20)." We quoted that language in *Rapid Transit Subway Construction Company* v. *City of New York* (LEHMAN, J.) (259 N. Y. 472 at 489), and then added: "Here we are relegated to the 'tests of honesty and justice' and no rigid yardstick has ever been fashioned which will measure honesty and justice." So in the instant case we are relegated to like tests since we cannot say that there is here any relation of parent and subsidiary, or any merger of corporate personality, between T G & T and B & M. The law in this type of case has not endeavored to fashion a yardstick to measure honesty and justice but, recognizing its impotency, has instead set up as a preventive measure, the rule that a trustee may not deal with itself nor mingle its own funds with those of the trust.

The prohibition against self-dealing or mingling of funds by a trustee does not depend upon any question of fraud but is

made absolute to avoid the *possibility* of fraud and to avoid the *temptation* of self-interest. The temptation is present whether the purchase is made directly from the trustee itself or from its " associate " company or the company with which it is " allied " or with which it maintains " close working arrangements to the mutual advantage of each company." The corporate trustee linked itself to B & M in those terms and words in its advertisements and minutes. All the other proof adduced as to the interrelation of the two companies only supported the judgment of the trustee as written by itself. (See *Wendt* v. *Fischer, supra, Baxter* v. *Trust & Savings Bank,* 273 Mich. 642, 646, 647; *Gates* v. *Plainfield Trust Co.,* 121 N. J. Eq. 460, 484–488, affd. 122 N. J. Eq. 366; *Rothenberg* v. *Franklin Washington Trust Co.,* 127 N. J. Eq. 406, 129 N. J. Eq. 361, 131 N. J. Eq. 463; 2 Scott on Trusts, p. 880.) In Restatement of the Law of Trusts, p. 436, section 170, comment on subsection (1), paragraph i, it is said: " A corporate trustee cannot properly purchase for the trust property owned by an affiliated or subsidiary corporation in which it has the entire interest or a controlling interest or an interest of such a substantial nature that there would be a temptation to consider its own advantage in making the sale and not to consider solely the advantage to the beneficiaries of the trust." In *Rothenberg* v. *Franklin Washington Trust Co.* (127 N. J. Eq. 406), it was said: " When the Trust Co. undertook administration of this trust it became bound by an inflexible rule of law applicable in every case, that one having a trust relation or obligation toward another shall not place himself in a situation in which he might be tempted to take advantage of his *cestui que trust,* and for any act in violation of the rule, no matter how pure his intention, such act is voidable at the instance of the person he represents."

The process of loaning money upon mortgages by T. G. & T., of selling them in order to obtain money to again loan on mortgages with the accompanying collection of loan fees, was so continuous and so bound up with the operations of B & M which guaranteed both the mortgages and parts apportioned and serviced the mortgages, that the business of either would have been seriously affected by the interruption in the relationship

or by the destruction of the other. Each needed the other, or thought it did, and established that fact by its own conduct. When the market prices of the stock of T. G. & T. and B & M were falling and their business appeared to be decreasing, the corporate trustee purchased stock of B & M and B & M purchased stock of T. G. & T. If the standard of undivided loyalty to a trust is to be maintained, the situation disclosed here requires the application of the rule against self-dealing as to all the whole mortgages. (2 Scott on Trusts, pp. 856, 873, 877, 909, 910; § 170.25; Scott, " The Trustee's Duty of Loyalty ", 49 Harv. L. Rev. 521, 541; *Meinhard* v. *Salmon, supra; Wendt* v. *Fischer, supra; Munson* v. *Syracuse G. & C. R. R. Co.,* 103 N. Y. 58, 73; *Ottawa Banking & Trust Co.* v. *Crookston State Bank,* 185 Minn. 22; *Matter of Filardo,* 221 Wisc. 589; *Matter of Bender,* 122 N. J. Eq. 192.)

Under the circumstances the corporate trustee *had placed itself* in a position where its interest was or *might be* in conflict with its duty. Either is sufficient to cause surcharging of the trustee. (3 Bogert on Trusts and Trustees [1935] § 543; *Magruder* v. *Drury,* 235 U. S. 106; *Jackson* v. *Smith,* 254 U. S. 586; *Ten Eyck* v. *Craig,* 62 N. Y. 406; *Pyle* v. *Pyle,* 137 App. Div. 568, 572, affd. 199 N. Y. 538; *Wendt* v. *Fischer, supra; Meinhard* v. *Salmon, supra.*) We shall quote from but one of the authorities cited. In *Ten Eyck* v. *Craig (supra,* at p. 419) we said: " The rule is inflexible, that he *shall not place himself* in a position where his interest is or may be in conflict with his duty. The reason of the rule, as remarked by KENT, J., in *Bergen* v. *Bennett,* (1 Cai. Cas., 19), is to bar the more effectually every avenue to fraud. Such a purchase, though it may not originate in any purpose to defraud, is a constructive fraud, because the natural tendency is mischievous and harmful. The rule is founded in the highest wisdom. It recognizes the infirmity of human nature, and interposes a barrier against the operation of selfishness and greed. It discourages fraud by taking away motive for its perpetration. It tends to insure fidelity on the part of the trustee, and operates as a protection to a large class of persons whose estates, by reason of infancy, infirmity, or other causes, are intrusted to the management of others."

We now reach the problem of the apportionment of part interests in bonds and mortgages to the trusts. The appellant trustee always acted under Banking Law, section 188, subdivision 7. It never invested in shares or parts of mortgages not held by it or in its own name. Payment of the apportionments of part interests were guaranteed by B & M. The discussion of the effect of the 1917 amendment to section 188, subdivision 7 (*supra*), has answered in large part the questions here presented. The amendment permitted self-dealing by a trustee and the mingling of its own funds with those of its *cestui que trust* in a limited degree within the terms of the statute. It provided, however, " but * * * such corporation shall promptly notify each person of full age and sound mind entitled to the income therefrom of the fact that such investment has been made * * *."

Concededly, the legislative command had some force, included as it was in a statute which relaxed in a limited way an ancient common law rule. On well settled principles of statutory construction " when a statute confers a right, privilege, or immunity, the regulations, forms, or conditions which it prescribes for its acquisition are imperative, in the sense that non-observance of any of them is fatal." (Maxwell on the Interpretation of Statutes, 6th ed., 1920, at p. 650.) The author further states: " Where powers or rights are granted, with a direction that certain regulations or formalities shall be complied with, it seems neither unjust nor inconvenient to exact a rigorous observance of them as essential to the acquisition of the right or authority conferred: and it is therefore probable that such was the intention of the Legislature." Concededly, if no notice were given, self-dealing and mingling of funds by T. G. & T. was improper. (*Matter of Bearns,* 251 App. Div. 222, affd. 276 N. Y. 590.) Did it have to be a prompt notice? Did it have to be a notice which to young men and women, unfamiliar with the mortgage market and neither lawyers nor real estate operators, would indicate that an apportionment had been made to a trustee of a *part interest* in a bond and mortgage owned by the trustee individually? We think that it was so required. That is what the statute provided. That was the condition upon which was based the extraordinary boon conferred upon a trust com-

pany as distinguished from all other fiduciaries, natural persons and corporations alike. If there were not compliance with the statute, there was no relaxation of the rule against self-dealing by the trustee. No one need be a trustee. We think that a trustee must obey a legislative command. So we held in *Matter of Bearns.* (*supra*). There the corporate trustee invested principal for an infant, who had a general guardian, in a part interest in a bond and mortgage. No notice was given to the general guardian and we held that the investment, was, therefore, improper and surcharged the trustee with the amount thereof. Since the failure to give notice goes to the legality of the investment, it follows as a corollary that there must be reasonably substantial compliance with the other legislative commands as to notice.

When we turn to the apportionments here we find that concededly there was neither intent nor attempt to give a notice under Banking Law, section 188, subdivision 7. The most that can be said is that the appellant trustee urges that while it is true that no attempt was made to comply with the statute by a specific notice thereunder, the quarterly statement sent by it to beneficiaries was a compliance and if that were not, then an annual statement later sent to beneficiaries was a compliance. Clearly these are after-thoughts but we shall nevertheless discuss and consider them. In that consideration, it will be well to remember that in *Matter of Union Trust Company* (*Hoffman*) (*supra*), a letter was promptly sent to each beneficiary advising of the investment made.

We shall first consider the quarterly statement. There is a " Specimen Quarterly Statement rendered to beneficiaries by Trustees " printed in the record. It is dated April 15th, 1931, and, after being addressed to a beneficiary, reads in part: " Dear Madam: The following is a statement of collections and disbursements for the above account, the check in settlement having been deposited to your account in our Brooklyn Banking Department, subject to your check." Then there is a heading " Received " followed by a statement of interest and dividend receipts. Then there appears the following: " Paid Out " and entries thereunder. For clarity there is now appended a copy of the second sheet of the Specimen

Exhibit containing some entries under " Received " and some under " Paid Out."

Specimen Quarterly Statement rendered to beneficiaries by Trustees.

| | | | | | |
|---|---|---|---|---|---:|
| " | " Palito | " | " | " | 48.12 |
| " | " Frodin | " | " | " | 110.00 |
| Mar. 31 | Dividends Maryland Trust Co.— Common Stock due Mar. 30 | | | | 33.60 |
| Apr. 2 | Interest Nassau Mortgage due April 1st | | | | 66.00 |
| 14 | Transfer from Estate Cornelius J. Ryan | | | | 29.47 |
| 15 | Interest Witmar Realty Corp. Mortgage due Apr. 15th | | | | 1,562.50 |
| | | | | | $2,448.52 |

### PAID OUT

| | | | |
|---|---|---:|---:|
| Apr. 15/31 | Typewriting & Clerk hire for the quarter ending Apr. 15th | 20.83 | |
| | Reserved a/c Trustees commission | 800.00 | 820.83 |
| Apr. 15/31 | Dell Ryan Lynch (Check deposited to your account) | | $1,627.69 |

### PRINCIPAL STATEMENT
### RECEIVED

| | | |
|---|---|---:|
| Jan. 15/31 | Balance on hand as per last statement | $447.67 |
| Feb. 26 | Brooklyn Trust Co., Liquidation Dividends of $100 per share Brooklyn Warehouse & Storage Co. Stock | 500.00 |
| | | $947.67 |

### PAID OUT

| | | | |
|---|---|---:|---:|
| Mar. 2/31 | Purchase Flach Mortgage-Rate 5½% Gtd. Int. Days — January — July,Due Date — February 9, 1934. | $900.00 | |
| 11 | Collector of Internal Revenue 1930 Income Tax — on Capital Gains | 3.44 | 903.44 |
| Apr. 15/31 | Leaving a balance of | | $44.23 |

The appellant trustee asserts that the entry under " Paid Out " was notice under section 1^8, subdivision 7, that T G & T was the owner of the mortgage and had apportioned to itself as trustee for the beneficiary named in the quarterly statement a part interest therein in the sum of $900. A mere reading of the quarterly statement is a full and complete answer. It was not a notice under the statute at all but if it should be so termed, it was a notice that a mortgage, and not an apportioned part of a bond and mortgage, had been purchased.

The appellant trustee then argues that, assuming that to be true, the annual statement constituted the required statutory notice. The annual statement, of course, contained no statement of investments made for the trust but only a statement of investments held in the trust. We pass over the point that

the statute commanded a prompt notice and that what was commanded was not an incorrect notice followed by a correct one, and instead examine the "Specimen Annual Statement Rendered to Beneficiaries by Trustees" printed in the record, a copy of a portion of which is as follows:

ANN FRANCES RYAN

STATEMENT OF SECURITIES HELD BY TITLE GUARANTEE AND TRUST COMPANY AND WILLIAM F. BROWN, SURVIVING TRUSTEES UNDER THE WILL OF CORNELIUS J. RYAN FOR THE BENEFIT OF ANN FRANCES RYAN.

*April* 20, 1928.

MORTGAGES

| | RATE | MATURITY | INT. DAYS | AMOUNT | SEMI-ANNUAL INT. |
|---|---|---|---|---|---|
| Martino | 5½ Gtd. | Jul. 1/28 | Jan.-Jul. | +$8 500 00 − | $233 75 |
| Dorite Const. Co., Inc., | 5½ " | Feb. 25/30 | Jan.-Jul. | + 2 250 00 | 61 87 |
| Mott | 5½ " | Mar. 29/30 | Jan.-Jul. | + 6 500 00 − | 178 75 |
| Handel Const. & Land Corp., | 5½ " | Jan. 6/29 | Jan.-Jul. | + 5 500 00 − | 151 25 |
| Lerner | 5½ " | Jul. 1/30 | Jan.-Jul. | + 8 000 00 − | 220 00 |
| Fincone Bldg. Corp. | 5½ " Ctf. | Sept. 1/28 | Jan.-Jul. | + 2 500 00 − | 68 75 |
| Killanna Realty & Const. Co., Inc., | 5½ " " | Sept. 17/30 | Jan.-Jul. | + 1 400 00 − | 38 50 |
| Siegel | 5½ Gtd. | Feb. 4/31 | Jan.-Jul. | + 7 000 00 − | 192 50 |
| Gem Concrete & Const. Co. Inc., | 5½ " Ctf. | Feb. 1/31 | Feb.-Aug. | + 4 000 00 − | 110 00 |
| Gem Concrete & Const. Co., Inc., | 5½ " " | Feb. 1/31 | Feb.-Aug. | + 3 000 00 − | 82 50 |
| 556 — 7th Avenue Corp., (1/6 Interest in $122,500.) | 5½ Str. Part. | Mar. 31/32 | Mar.-Sept. 31st | +20 416 66 − | 561 45 |
| Schwartz | 5½ Gtd | Apr. 7/28 | Apr.-Oct. | + 1 300 00 − | 35 75 |
| Montone | 5½ " | Oct. 13/28 | Apr.-Oct. | + 2 750 00 − | 75 62 |
| Daly | 5½ " | May 3/29 | Apr.-Oct. | + 5 500 00 − | 151 25 |
| Vastola | 5½ " | Apr. 23/30 | Apr.-Oct. | + 6 000 00 − | 165 00 |
| Gerrittsen Park, Inc., | 5½ " | Nov. 19/29 | Apr.-Oct. | + 2 500 00 − | 68 75 |
| White, Delia J | 5½ " | Nov. 12/30 | Apr.-Oct. | + 4 500 00 − | 123 75 |
| Krauss Bldg. Corp., | 5½ " | Apr. 2/29 | Apr.-Oct. | + 3 750 00 − | 103 12 |
| Krauss Bldg. Corp. | 5½ " | Apr. 2/29 | Apr.-Oct. | + 3 750 00 − | 103 12 |
| Witmar Realty Corp., (1/6 Interest in $375,000 Mtge). | Str. 5 Part. | Apr. 15/37 | Apr.-Oct. 15th | +62 500 00 − | 1 562 50 |

Again the statement was as to "Mortgages" and not as to apportionments of part interests in bonds and mortgages. The appellant trustee, however, urges that wherever there appears under the heading "Rate" the figures and letters "5½ Gtd Ctf" or "Gtd" (the mortgages against which the entries "Str. Part." appear are not here involved) that, as to the mort-

gages against which those entries appear, there was notice under section 188, subdivision 7, to the beneficiaries that T G & T was the owner of a bond and mortgage and that it had apportioned to itself as trustee for the beneficiary, a part interest therein. That contention cannot be sustained. There was no notice given and thus no relaxation of the rule against self-dealing.

There were other notices (denominated Statements) and other quarterly and annual statements sent to beneficiaries which contained wording which the learned Surrogate found apprised the beneficiaries that there had been apportioned to them part interests in bonds and mortgages of the appellant trustee. Whether or not such notices or statements were specific attempts to comply with the Banking Law, section 188, subdivision 7, or complied therewith it is enough that it has been found that notification as commanded by the Legislature was *received* by those entitled to it. Those were findings of fact, supported by the evidence, which have been affirmed by the Appellate Division and are not reviewable in this court. (See Surrogate's Court Act, § 71.)

The full consideration of the facts, *ante,* as to self-dealing by the appellant trustee, the mingling of its funds with those of the trusts and the interdependency of T G & T and B & M necessitate but a brief discussion of two remaining related points. There have been three prior accountings: a decree of May 31, 1917, settling the accounts through December 31, 1916, a decree of May 2, 1922, settling the accounts through October 20, 1921, a decree of January 19, 1928, settling the accounts through April 20, 1927. Surcharges were sought not only with respect to transactions occurring during the period of the present accounting but also with respect to those occurring during the periods of the two prior accountings ending in 1921 and 1927. The learned Surrogate granted the application of objectants so far as was necessary to throw open to decision all of the objections to the purchases of whole mortgages upon the ground that the prior accounts " wholly failed to reveal the manner in which the mortgages were acquired." The learned Surrogate took as a typical instance of such failure, the statements with respect to the Curti mortgage in a prior accounting. He said: " In the C. J. Ryan trust there was a so-called Curti mortgage for $6,750. According to the stipulation of fact this mortgage was assigned

by the corporate trustee to Bond and Mortgage Guaranty Company on November 24, 1925, and on the same date reassigned by the latter company to the trust. The information concerning this mortgage which was reported in the last account is contained in schedule I–4 of the former account. Therein are reported the investments outstanding at the beginning date of the accounting period, October 20, 1921, the investments purchased during the accounting period, the investments collected or sold and the manner in which the balance in the trust was invested at the close of the accounting period. Opposite the date December 8, 1925, in this schedule there is reported the purchase of ' Bd. & Mtge.' of a mortgagor named Curti at a cost of $6,750. The later schedule of the investments on hand shows the same entry. It is quite apparent that such an entry made no disclosure of the underlying self-dealing of the corporate trustee. The court holds the disclosures in the prior schedules inadequate and holds that notwithstanding the former decrees it may make inquiry now as to these purchases.''

There were only six apportionments of part interests in bonds and mortgages held by the appellant trustee, and those were in the Hulswit and T. B. Ryan trusts, at the time of the previous accounting. It was unnecessary to open the prior decree as to those apportionments since no notice under Banking Law, section 188, subdivision 7, had been given until at least six years after their purchase and they had been carried either in the annual statement or in the 1927 account as a bond and mortgage and not as an apportionment.

It is the contention of the appellant trustee that each beneficiary had full knowledge of the self-purchase by it and acquiesced therein. That contention proceeds upon the following facts. The beneficiaries were infants when the trusts were set up and income was accumulated for each during minority. They lived in Scranton, Pa. and were represented by a firm of lawyers there, except that one beneficiary was also represented by an additional New York City lawyer for a brief period. As they reached majority the accumulated income was turned over to them after a list of all the securities in the respective trusts had been submitted to their attorneys in order that the beneficiaries might select securities instead of cash as payment. Each in turn selected securities consisting, among others, either of

whole mortgages or of whole mortgages and apportionments of mortgages. None of the securities so selected is involved here. When the selection was made each executed a general release. As to the objectant Lynch, the release acknowledged that the payment was " being made by said trustees for the purpose of turning over to me and placing in my possession *the accumulated income* to which I am now entitled ". It then went on to say that the trustees had " rendered an account satisfactory to me, which account contains a summary statement as follows: * * *." There then appeared a summary statement of both principal and income account, containing the same figures as shown in the summary statement in the account forwarded previously to her attorneys. That paper showed, as to principal, a list of securities held by the trust.

The general release was as to accumulated income only and not as to principal. That was all it purported to be. The appellant trustee so construed the document when it filed subsequent accounts. In each instance, the accounting subsequent to the release included a period antedating the release. The releases disclosed no more than the accounting schedules in the subsequent accountings. Concededly there was no disclosure of either the self-dealing of the appellant trustee nor of the interrelation between T G & T and B & M to either the beneficiaries or their attorneys and the releases would be a defense only if there had been.

As indicated (*supra*) none of the mortgages or apportionments accepted by the beneficiaries in lieu of cash for accumulated income is here involved and no direct disclosure of improper conduct is claimed. What, then is the contention of the appellant trustee? We shall take the transaction with T. B. Ryan when he reached his majority. In at least one other trust, the beneficiary never saw any papers so that the T. B. Ryan trust probably presents favorably for it the contention of the appellant trustee. After T. B. Ryan signed the release, he signed a receipt for ten bonds and mortgages, together with numerous other documents of title including assignments, extension agreements, guarantee policies, and three mortgage apportionments. Apparently he signed the release and later obtained the documents. The transaction was by correspondence and mail. The appellant trustee urges that since among those papers

there were assignments from T G & T to B & M and from B & M to T G & T as trustee, this young man knew or should have known or was put upon notice that the assignments to B & M were not assignments made in good faith but that the bonds and mortgages, so turned over to him, had really been sold by the corporate trustee to itself, that its conduct was therefore improper and would continue to be equally improper as to all other similar transactions occurring thereafter.

The appellant trustee phrases it more clearly as follows in its brief as appellant:

" These beneficiaries cannot now successfully assert that they believed that by mere accident, only the certificates and mortgages which they selected from a pool of investments were of one origin and that all that remained in the portfolio representing principal had been purchased from other sources."

 \* \* \* \* \* \* \*

" Disclosure of any invalidity in trust investments is sufficient if there be brought home to those who have a right to complain such facts and circumstances as to warrant the conclusion that comparable investments received comparable treatment, whether of purchase or of service; that possible defects in one found their counterpart in others of the same type and kindred.

" Such knowledge was brought home to these beneficiaries. The disclosures made to them were sufficient to point out the specific procedure followed by the trustees in making these investments. If they felt that there was any such self-purchase, as they now complain about, they could have made their protest known to the trustees and the evil, if evil it was, could and would have been eliminated, and without loss to the trustee."

There is no evidence that any beneficiary or any attorney for any beneficiary had any knowledge of self-dealing by the appellant trustee or of the relationship existing between T G & T and B & M before the present accounting. The learned Surrogate found to the contrary. He said " The court finds on the contrary that the beneficiaries and the Pennsylvania lawyers were equally in the dark as to the self-dealing of the corporate trustee. The whole tenor of the documents signed by the beneficiaries and the letters written by or for them indicates a belief

on their part and on the part of their lawyers that Bond and Mortgage Guaranty Company was wholly independent of the corporate trustee." We shall not stress the point that the argument here advanced by the appellant trustee is at variance with its insistence that the transfers to B & M and back were *bona fide* and valid ones.

*Matter of Long Island Loan & Trust Co.* (92 App. Div. 1, affd. on opinion below, 179 N. Y. 520, *supra*) is in point both on the matter of opening the decrees and the claimed acquiescence. There it was said in the opinion, which this court adopted as its own: " It does not appear to be seriously contended that the trustees had a right to deal with the trust fund in the manner which it is agreed was done, but it is urged that the life tenant * * * has been estopped by a former decree. It appears that in 1893 the trustee made a report to her in which appears this entry: ' February 1, 1893, L.I.L. & T. Co., T. Donohue Mtge. No. 3, $7800.' Just how this was calculated to give the life tenant notice of the state of facts which is now developed, it is difficult to understand. * * *.

" The trustee accounted in 1898, but none of the questions here raised was put in issue in that proceeding, and the decree on that accounting discharged the trustee only as to the assets directed to be distributed thereunder and the amount of the trust estate. As the trustee claims this decree to have worked an estoppel, the burden of proof is upon the trustee to show clearly that the question in issue in this case was litigated and determined in the former proceeding (*Rudd* v. *Cornell*, 171 N. Y. 114, 127, and authority there cited), and having failed to show this, the life tenant is not estopped to assert her rights at this time. Nor is the position of the trustee changed by the fact that the life tenant made a motion in May, 1903 to open the decree of August, 1898, in which the matters here involved were set up as a reason for opening the former decree. The opening of the former decree rested in the discretion of the learned Surrogate, and as the former decree did not attempt to settle any of the questions which are urged on this motion, the denial of the motion did not affect any substantial right of the life tenant, and, under well-established rules, *it could not work an estoppel on this accounting*."

As to acquiescence that case followed *Adair* v. *Brimmer* [1878] (74 N. Y. 539, 553, 554) in which it was said (RAPALLO, J.) : " The testimony as to a ratification of these transactions is contradicted by the contestants, and the auditor has found against such ratification. We concur in his conclusion. To establish a ratification by a *cestui que trust,* the fact must not only be clearly proved, but it must be shown that the ratification was made with a full knowledge of all the material particulars and circumstances, and also in a case like the present that the *cestui que trust* was fully apprised of the effect of the acts ratified, and of his or her legal rights in the matter. Confirmation and ratification imply to legal minds, knowledge of a defect in the act to be confirmed, and of the right to reject or ratify it. The *cestui que trust* must therefore not only have been acquainted with the facts, but apprised of the law, how these facts would be dealt with by a court of equity. All that is implied in the act of ratification, when set up in equity by a trustee against his *cestui que trust, must be proved, and will not be assumed.* The maxim ' *ignorantia legis excusat neminem,*' cannot be invoked in such a case. The *cestui que trust* must be shown to have been apprised of his legal rights. (*Cumberland Coal Co.* v. *Sherman,* 20 Md. R. 151; S. C., 30 Barb., 575; *Lammott* v. *Bowley,* 6 H & J 526)."

That rule has been followed in this State to date. (*Wendt* v. *Fischer, supra; Matter of Young, supra; City Bank Farmers Trust Co.* v. *Cannon,* 291 N. Y. 125.

The order should be affirmed, with costs to all parties filing separate briefs payable out of the estate.

LEHMAN, Ch. J. (dissenting in part). No new formulation of the questions of law presented upon this appeal, or further statement of the material evidence which must be considered in the determination of these questions is necessary. I accept the careful formulation of the questions of law and the accurate statement of the evidence contained in the opinion of Judge CONWAY. I agree with the conclusion of Judge CONWAY that though the statute authorized a trust company to make investments as " personal or testamentary trustee " in a bond or mortgage held by the trust company " by apportioning to the trust fund a part interest therein " (Banking Law, § 188, subd.

7, as amd. by L. 1917, ch. 385), a trust company was not permitted under that statute to invest moneys which it held as trustee by purchasing as trustee whole mortgages owned by it. The rule that a trustee assumes a fiduciary obligation of undivided loyalty and may " not place himself in a position where his interest is or may be in conflict with his duty ", and the corollary rule that a trustee may not sell securities as owner and purchase them as trustee, are not technical rules but are general rules of conduct long ago formulated by courts of equity " to prevent fraud and to weaken temptation to dishonesty." A violation of a technical rule may at times be disregarded where the violation was due to ignorance or inadvertence and caused no damages, but disregard of a violation of the rule of equity, even though such violation may be venial, and the trustee may in fact have exercised his judgment and performed his duty honestly, with a view solely to the best interest of the trust estate uninfluenced by his personal interest, would, at least, diminish the usefulness of the rule. " Its rigidity gives it one of its chief uses as a preventive or discouraging influence ". (*Munson* v. *Syracuse G. & C. R. R. Co.,* 103 N. Y. 58, 74.) In accordance with that rule, the trustee should be surcharged with all moneys invested by the trustee in mortgages owned by it where the investment was not made by apportioning shares in such mortgages, except insofar as beneficiaries of the trust are barred from objecting to such investments by decrees in accounting proceedings to which the beneficiaries were parties or by releases given by such beneficiaries. I agree, too, that investments made by purchase of whole mortgages owned by the trust company at the time when it decided as trustee to purchase the mortgage should be included in the prohibited investments, even though the transfer to the trustee was made by the Bond and Mortgage Company in accordance with business routine established by the two companies. I disagree with those parts of the decision which hold (a) that there should be included in the prohibited investments purchases made by the trustee of mortgages which were owned by the Bond and Mortgage Guarantee Company, an affiliate of the trust company; (b) that the trustee should be surcharged for some investments made through apportioning parts of mortgages owned by it because notice of such investments was not

given in accordance with the statute; and (c) that decrees in prior accountings should be opened and that such decrees and releases given by beneficiaries of the trust were not binding upon the beneficiaries.

The Bond and Mortgage Guarantee Company, it may be conceded, may properly be described as an " affiliate " of the trust company. The same stockholders who control the Title Guarantee & Trust Company probably control also the affiliate. Many of the officers and some of the directors are the same, and, as Judge CONWAY points out, there is very close interrelation in the conduct of their affairs and at times they share the use and expense of clerical and executive employees, of advertising and of office space. It conclusively appears, nonetheless, that the two corporations are separate entities. They were formed for distinct though related purposes. The capital of each was used for its own corporate purposes; — the corporate profits of each constituted a fund from which dividends could be paid only to its own stockholders, and the trust company owned only a small fraction of the stock of the Bond and Mortgage Guarantee Company. The close relationship in the conduct of the business of the two corporations formed for related purposes doubtless was useful to both, but in no respect did either lose its identity. The question presented upon this branch of the appeal is not whether the rule which prohibits a trust company from purchasing as trustee securities which it sells as owner should be rigidly enforced (for, as I have said, the companies concededly are not identical), but rather whether the obligation of undivided loyalty has been violated when the trust company purchased as trustee securities which were sold to it by another corporation connected with the trust company by such close ties. As Judge CONWAY points out, in determining whether the relationship between the two companies is so close that the trustee violated its obligation of undivided loyalty " we are relegated to the ' tests of honesty and justice ' and no rigid yardstick has ever been fashioned which will measure honesty and justice." Concededly there has been no conscious dishonesty by the trust company, and its interest in a possible profit which the Bond and Mortgage Guarantee Company might derive from the sale of its mortgages to the trustee, was I think, too remote to place it in a position where interest might conflict with duty. Under such

circumstances I can find no basis for surcharging the trustee with purchases made from its affiliate.

The surcharge for investments made by the trustee by apportioning to the trusts shares in mortgages which the trustee owned, is based upon a conclusion that the trustee failed promptly to notify each beneficiary '' of the fact that such investment has been made '' as required by the 1917 amendment to section 188, subdivision 7, of the Banking Law. The statute which permitted such investments and required that notice thereof be given promptly does not in terms provide that the investment is invalid *unless* such notice is given, nor does it provide that upon receipt of such notice the beneficiary may object to the investment. The purpose of the Legislature in requiring statutory notice of the investment is to enable a beneficiary '' to identify and establish [his] interest in the mortgage '' and to make it unnecessary for a beneficiary to maintain an action '' to identify and establish [his] interest in the mortgage.'' (*Matter of Union Trust Co. [Hoffman]*, 219 N. Y. 514.) Failure to give notice sufficient for that purpose may properly bar assertion by the trust company that it has, without notice, transferred to the beneficiary of the trust estate a share in a mortgage which it owned. (*Matter of Bearns*, 251 App. Div. 222, 276 N. Y. 590.) Where a beneficiary is furnished with that information, technical defects in the service of the notice, furnish no ground for rejection of the investment. Here the trust company sent to each beneficiary a quarterly statement of the account and in that quarterly statement the amounts invested in mortgages described in the account appeared. Though at times the quarterly statement failed to state that amounts so appearing were invested in guaranteed certificates of participation rather than in whole mortgages, and though other defects may be urged in the description of the investment, it can hardly be disputed that the quarterly statement contained data sufficient to enable each beneficiary to identify and establish his or her interest in the mortgage. None would be compelled to maintain any action to identify and establish such interest. In such case the purpose of the notice is fully served, and technical objections to the form of the notice do not render the investment illegal.

Finally, we reach the question whether the decrees in the accounting proceedings and the releases given by beneficiaries bar the beneficiaries from objecting to transactions included in the decrees or in the releases. The beneficiaries were represented by counsel upon these accountings, and when they gave releases. Though the trust company did not make express disclosure that it had purchased mortgages from itself, it did not conceal what it had done, or refuse to furnish any information which counsel asked. Its failure to state affirmatively that it had purchased mortgages from itself is easily explained by the fact that the trust company at that time did not know that the statute failed to sanction such purchases. The accumulated interest was payable to each beneficiary when the beneficiary reached the age of twenty-one. In some cases that accumulated income was paid to the beneficiary by transfer to the beneficiary of guaranteed mortgages which the trustee had purchased from itself or from the Bond and Mortgage Guarantee Company, and the beneficiary received the *indicia* of title showing the manner in which the mortgages were acquired by the trust. The beneficiary thus had notice that at least in some instances the trustee was making investments which the beneficiary now urges were illegal. In such case, it seems clear to me, the beneficiary may not claim that there was no full disclosure by the trustee. On the contrary, by failure to object the beneficiary acquiesced in the manner in which the trustee made its investments.

The order of the Appellate Division and the decree of the Surrogate's Court should be modified accordingly.

LOUGHRAN, RIPPEY, LEWIS and DESMOND, JJ., concur with CONWAY, J.; LEHMAN, Ch. J., dissents, in part, in separate opinion.

Order affirmed, etc.