JESSIE S. PERKINS, as Executrix of WILLIAM A. SCHENCK, Deceased, Respondent, *v.* JOSEPH MEYER, JR., et al., Appellants.

Argued October 10, 1950; decided January 18, 1951.

140

*I. Maurice Wormser, John M. Keating* and *Albert H. Brodkin* for appellants. I. The settlement agreement is a pledge agreement, because it provides that the payments made thereunder shall be " secured " by transfer of title and possession of " collateral " to a trustee for the redemption of the collateral against payments made, for the sale of the collateral in the event of default, for the proceeds of such sale to be applied to reduce the

unpaid balance due, and for any excess of such proceeds to be paid to the debtors. Characterizing the pledgeholder as a trustee does not change the nature of the pledge agreement. (*Stearns* v. *Marsh,* 4 Denio 227; *Mitchell* v. *Roberts,* 17 F. 776; *White* v. *Platt,* 5 Denio 269; *Wilson* v. *Little,* 2 N. Y. 443; *Barber* v. *Hathaway,* 47 App. Div. 165, 169 N. Y. 575.) II. A pledge agreement may provide for a trustee to hold the pledge; such trustee is considered the pledgee's agent. (*Matter of Rogers,* 20 F. Supp. 120; *Citizens' Nat. Bank of Fort Scott* v. *Bank of Commerce,* 80 Kan. 205; *Connecticut Trust & Safe Deposit Co.* v. *Fletcher,* 61 Neb. 166; *Brewster* v. *Hartley,* 37 Cal. 15; *Horton* v. *McFerson,* 94 Col. 361; *Danforth* v. *Denny,* 25 N. H. 155.) III. The creditor for whose benefit the collateral was given was legally incapacitated from purchasing the collateral at a sale thereof unless specifically authorized to do so; it is immaterial whether the creditor makes the purchase in good faith or at the market price or at a bona fide liquidation sale. (*Bank of the Old Dominion* v. *Dubuque & Pacific Ry. Co.,* 8 Iowa 277; *Maryland Fire Ins. Co.* v. *Dalrymple,* 25 Md. 242; *Roach* v. *Duckworth,* 95 N. Y. 391.) IV. There was ample consideration for the agreement of July 22, 1942, because defendants waived the creditor's disability to purchase the collateral at the auction sale, waived the requirement that the purchaser pay cash at the auction sale, and because, if the creditor subsequently sold the securities for a lesser price than they had brought at the auction sale, the loss would be borne by defendants. (*Varney* v. *Ditmars,* 217 N. Y. 223; *United Chemical & Exterminating Co.* v. *Security Exterminating Corp.,* 246 App. Div. 258.) V. Only by the agreement of July 22, 1942, did defendant Meyer waive the creditor's disability to purchase the collateral; by denying the attorney's authority to make the agreement on his behalf the creditor lost the benefit of defendant's waiver of disability. Therefore, when the creditor purchased the collateral, as a matter of law it remained a pledge, which the creditor was required to sell, upon defendant's demand in October, 1943, when such sale would have satisfied the debt in full and yielded a surplus to defendant. (*Bank of the Old Dominion* v. *Dubuque & Pacific Ry. Co.,* 8 Iowa 277; *Howell* v. *Dimock,* 15 App. Div. 102.)

*E. F. W. Wildermuth, John S. McCook, Charles A. Roberts* and *Thomas G. Prioleau* for respondent. I. The creditor was not a pledgee. He was under no disability to purchase the collateral at the trustee's sale. The sale has not been attacked, and the creditor thereby became the owner of the securities. (*Easton* v. *German-American Bank,* 127 U. S. 532.) II. The alleged oral agreement lacked consideration and was void. (*Smith* v. *Browning,* 225 N. Y. 358; *Hirsh* v. *Auer,* 146 N. Y. 13; *Blanco* v. *Velez,* 295 N. Y. 224; *Albany Exch. Sav. Bank* v. *Brass,* 59 App. Div. 370, 171 N. Y. 693; *Costello* v. *Costello,* 209 N. Y. 252; *Varney* v. *Ditmars,* 217 N. Y. 223; *Queensboro Farm Products, Inc.,* v. *State of New York,* 262 App. Div. 426, 287 N. Y. 797.) III. The creditor's attorney was without power or authority in law or fact to enter into the claimed oral agreement. (*Lewis* v. *Duane,* 141 N. Y. 302; *Craighead* v. *Peterson,* 72 N. Y. 279; *Porges* v. *United States Mtge. & Trust Co.,* 203 N. Y. 181.)

DESMOND, J. To settle this action (for fraudulent conspiracy) which had been brought, in 1939, by plaintiff's testator Schenck against defendants and was then pending untried, a written agreement was entered into in 1940, whereby defendants paid plaintiff's testator $20,000, and promised to pay him $180,000 more in installments. As security for those deferred payments, defendants agreed to, and did, transfer to a trustee, title to, and possession of, shares of stock and other property belonging to defendants. The trustee chosen for this purpose by the parties was one of the attorneys then representing defendants. The agreement of compromise provided that, on default by defendants in making any of the deferred payments, the trustee was, upon request of the creditor (plaintiff's testator Schenck), empowered to " liquidate any or all of the collateral ". Defendants in 1942, defaulted as to some of their promised payments. The creditor Schenck thereupon requested a sale of the securities, and the trustee gave notice of, and conducted, through an auctioneer, a public sale thereof. At that vendue creditor Schenck was the highest bidder, and so he purchased all the collateral and gave credit to defendants, on the indebtedness, for the amount of his bid. After such credit had been so applied, there was a balance unpaid on the settlement price, and plaintiff moved for judgment therefor, this being pursuant to the earlier

settlement pact, which provided for entry of judgment for such balance, on default.

Defendants, however, pleaded by way of counterclaim in an amended answer they then filed, and testified, that Schenck's purchase of the pledged securities, at the auction, was subject to an oral agreement made just before the sale, by the terms of which, according to defendants, Schneck would buy in the property but would give defendants '' a right to it '', and credit them, not with the amount of his bid, but with the amount for which he should later resell the property. The trial court, dismissing the counterclaim as matter of law, refused to submit to the jury the question of fact as to whether such an oral promise was actually made by Schenck. There was no statement by the court as to its precise ground for dismissal, but the motion therefor had urged that the alleged oral agreement, enforcement of which was prayed for in the counterclaim, was unenforcible because of lack of consideration, because of vagueness and incompleteness, and for other reasons. The Appellate Division (with a minor modification not here contested) concurred in that disposition.

Appellants say that there was consideration for Schenck's alleged promise, made on the day of the auction sale. As appellants reason it out, creditor Schenck, as a pledgee, was forbidden by law to be the purchaser at the sale of the pledged property without the consent of the pledgeors. Therefore, say defendants, the permission given by them, as pledgeors, to Schenck, to bid and buy, constituted sufficient consideration for the agreement, which defendants say Schenck made, that he would hold the stock for a later and better turnover for appellants' benefit. But that argument rests on the assumption that this was a simple pledge or pawn from defendants to the creditor Schenck. It takes no account of the presence in the picture of a trustee, chosen by the parties and given title and possession of the collateral, with obligations to hold and protect it and power and duty to sell it on default. The transaction was, of course, a pledge. Defendants were the pledgeors and Schenck the pledgee. But, by agreement and in fact, there was a third party: '' the holder of the pledge in trust for the purpose '' of the pledge (*Union Ins. Co.* v. *Central Trust Co.*. 157 N. Y. 633, 639).

That there was such a third party (call him " trustee " or " pledgeholder " or " agent " or what you will) makes all the difference as to whether or not Schenck had a clear right of his own, and not by leave of defendants, to buy in at the auction sale.

When there is such a trustee, the law which disqualifies a pledgee from being the vendee, has no application. Since the prohibition against a pledgee buying is based on a trust relationship to the pledgeor (*Toplitz* v. *Bauer,* 161 N. Y. 325, 332), the prohibition does not exist when a third party is constituted a trustee by the parties. The leading case is *Easton* v. *German-American Bank* (127 U. S. 532). That decision, in plainest terms, says that a creditor, for whose benefit a third party holds pledged property as trustee, may purchase the pawn at a sale held by the trustee under the terms of the trust. The Supreme Court, in the *Easton* case (*supra*), first set forth (see pp. 536, 537) the general rule that, where a creditor is a direct pledgee and himself sells the property pledged, he, being the vendor, cannot be the vendee also. The Supreme Court noted that in such a simple pledge relationship the pledgee-creditor " is in the position of a trustee to sell, and is by a familiar maxim of equity forbidden to purchase for his own use at his own sale." However, the Supreme Court went on to say (p. 538) that it was " very plain " that these familiar principles did not apply in the *Easton* case where the pledged *res* (just as in our case) " was conveyed by the debtor, not directly to the creditor, but to a stranger." Pointing out that, in the *Easton* case (just as in our case) " the sale was made under the direction and control of the trustee " the Supreme Court held that " as the creditors who held the obligations of the debtors were not themselves trustees, there was nothing, either at law or in equity, to prevent their being bidders and becoming buyers at the trustee's sale." " In reference to that sale " the court said further, " they occupied no position towards the debtor of trust or confidence. They were charged in respect to it with no duty whatever. They had an interest in it that the property should produce enough to satisfy the debts which it had been given to secure. Beyond that they had neither interest nor duty, and in their own interest the creditors had a right to bid so as to prevent the

property from being sacrificed at the sale below its value in order that it might be made to produce the largest amount towards payment of the debt " (127 U. S., p. 538).

It can make no difference that, in the *Easton* case (*supra*), the debt to the bank was, indirectly, secured by a deed of trust of real property, which deed ran to the third party as trustee. The Supreme Court treated the Easton transaction as a pledge and called it a pledge. In its opinion the court stated the general rule as to simple pledges: that the pledgee-creditor cannot be the vendee, and then held that this rule did not apply to a pledge where title and possession went to a third party and not to the creditor or creditors. Similarly, the Circuit Court opinion of Judge WALLACE, in *Easton* v. *German-American Bank* (24 F. 523), treats the case as one controlled by the law of pledge. Judge WALLACE wrote (pp. 526–527): " The reason why a pledgee cannot ordinarily acquire a valid title as against the pledgeor by a purchase of the property pledged, although the sale is regularly and publicly made, unless the pledgeor assents, (*Middlesex Bank* v. *Minot,* 4 Metc. 325; *Bryan* v. *Baldwin,* 52 N. Y. 232) is because he cannot be at the same time a vendor and a purchaser of the property. The defendant here was not the vendor, but occupied the position of a creditor, or of a *cestui que trust,* seeking to realize as much as might be practicable out of a fund by which its debt was secured. The defendant and the pledgeors stood upon terms of complete equality."

It is true that, in the *Easton* case (*supra*), the underlying (but not direct) security to the bank was real property, but the case has everywhere been treated and regarded as a controlling authority on the law of pledges, and so applied in many decisions including *Morris* v. *Windsor Trust Co.* (213 N. Y. 27) and *First Bank of Nostasulga* v. *Jones* (156 App. Div. 277, 167 App. Div. 929, affd. 222 N. Y. 579). A case which cites *Easton* v. *German-American Bank* (*supra*) in this connection, and states well its rule, is *Monroe Bros. & Co.* v. *Fuchtler* (121 N. C. 101, 104) where the court said: " He [the trustee] is the agent of both the maker of the deed and the *cestui que* trust. * * * The *cestui que* trust has a right to buy at the trust sale."

That the rationale of the rule, which disqualifies a true pledgee from buying, is not special or peculiar to either personal or real property, appears from many of the authorities. Probably the

first statement in this court that a pledgee may not buy without the pledgeor's permission is in *Bryan* v. *Baldwin* (52 N. Y. 232, 235). That very case says that the reason why a true pledgee may not buy is because he himself is exposing the pledged thing for sale. The citation by this court, in *Bryan* v. *Baldwin* (*supra*), of *Torrey* v. *Bank of Orleans* (9 Paige 649, affd. 7 Hill 260) and *Hawley* v. *Cramer* (4 Cow. 717, 736) shows that the disability of a true pledgee is only that which befalls any person who, in any character, occupies a position of trust or confidence in reference to the subject of the sale. It is significant that *Hawley* v. *Cramer* (*supra*) and *Torrey* v. *Bank of Orleans* (*supra*), cited in *Bryan* v. *Baldwin* as the bases for the rule against pledgee purchases, are both real property cases.

It follows from all the above that, when the trustee conducted this auction sale, the creditor Schenck had as much right as anyone else to be a bidder, and needed no permission from anyone. Thus, the debtor's purported permission was meaningless and could not form a consideration for any alleged promise by the creditor Schenck that, after he would buy, he would continue to hold the property for the benefit of the debtor.

And even if the debtor's consent to a purchase by the creditor, under these circumstances, could somehow amount to a consideration for the creditor's promise to hold the stock, that promise by the creditor, as testified to here by the debtor, was so vague and so lacking in essential terms, that no court could find a way to enforce it. The farthest that any testimony for defendants goes in this connection is to say that the creditor's attorney promised: " ' we will credit Joe [defendant Joseph Meyer, Jr.] with the amount that we actually sell the securities for, after they come into our possession.' " Other testimony for defendants was that this lawyer said: " ' We do not want to leave it in the name of the trustee because attachment may be made of your [Meyer's] interest in the stock in the hands of the trustee. We want to get the property out of the hands of the trustee. We will bid it in, give you a right on it and credit you not with the amount of our bid but the amount for which the stock is actually sold by us.' " There was nothing said, in that alleged promise by Schenck's lawyer, as to when, how, at what price, or in what state of the market Schenck would resell. Since no court can write a new contract, or fill in the blank spaces, for

these people, we are left with an alleged agreement which is ineffective for any purpose since it lacks the " how, where and when " needed to make it a full and understandable promise. Appellants attempt to answer this by claiming that, even after the alleged agreement was made on the day of the auction sale, and even after Schenck's purchase at that sale, Schenck was still a pledgee. So, they say, there was no need of any specification as to where, when and how he could resell. But that argument assumes that Schenck's purchase at the auction sale left him still in the position of a pledgee, which is directly contrary to appellants' own theory and testimony, above referred to, that they themselves consented that Schenck become the purchaser (see *Bryan* v. *Baldwin,* 52 N. Y. 232, 235–236, *supra*). A pledgee, who with the pledgeor's permission, buys the collateral, is no longer a pledgee, but a true and actual owner. Perhaps Schenck and Meyer could have agreed that after the sale Schenck would still be a pledgee, but there is no claim or testimony here of any such arrangement. Appellants are caught in the meshes of their own theory. Having for one purpose claimed that they had agreed and arranged that Schenck would be the purchaser, they then claim that Schenck was not a purchaser at all but remained a pledgee, even after the sale, because he had no right to be the purchaser. That is a self-defeating argument. The counterclaim of appellants here does not seek to set aside or reform the auction-day agreement (see *Bryan* v. *Baldwin, supra*, p. 235; *Roach* v. *Duckworth,* 95 N. Y. 391, 401–402), but aims to enforce it. If it is, as we hold, essentially unenforcible by its own terms, appellants can have no relief. The counterclaim seeks damages for the breach, by plaintiff's testator, of a promise; but the promise, as we have seen, is, on its face, too vague and incomplete for enforcement.

Respondent, as against the counterclaim, made other attacks which need not be dealt with here. We are convinced that the result of the auction sale made plaintiff's testator the absolute and unconditional owner of the collateralled stocks, without any obligation in respect thereto except to credit to defendants' account (as plaintiff's testator did) the price he had bid at the auction sale.

The judgment should be affirmed, with costs.

CONWAY, J. (dissenting). In February of 1940, the plaintiff's testator, Schenck, entered into a written agreement of pledge with defendants, in which, for the sum of $200,000, he compromised an action commenced by him in 1939. The defendants paid Schenck $20,000 upon the execution of the settlement agreement, and agreed to pay the balance of $180,000 in specified installments. The payment of these installments was to "be secured by the due and proper transfer of title and possession of collateral * * * to a trustee". The collateral consisted, in part, of certificates representing shares of stock in two oil corporations. Upon default, the agreement empowered the trustee to liquidate the collateral when so directed by Schenck, and to apply the proceeds thereof in reduction of the unpaid balance due under the settlement agreement and then to pay the excess, if any, to the defendants. The defendants defaulted in the payment of the installments on March 9, 1942, at which time the balance due Schenck was $119,200. For the sake of clarity, Schenck will hereafter be called the pledgee.

We are here concerned with the question of the legal relationship between the parties created by this settlement agreement, and with the further question of the legal effect of an alleged subsequent oral agreement between them. Since the courts below have directed judgment in plaintiff's favor and dismissed defendants' counterclaim, as matter of law, we must, upon this appeal, consider the facts in the light most favorable to defendants, and give them the benefit of every favorable inference which may reasonably be drawn. (*Osipoff* v. *City of New York*, 286 N. Y. 422, 425; *Hedeman* v. *Fairbanks, Morse & Co.*, 286 N. Y. 240, 244.) The facts, thus ascertained, are these: Following defendants' default, Schenck directed the trustee to liquidate the oil stock held as collateral. The stock was noticed for sale at public auction on July 22, 1942. Prior thereto, during the months of June and July, 1942, the parties held frequent conferences to discuss the situation. They all recognized that the then market price of the oil stock did not reflect its true value and that the market price was likely to rise in the near future. A sale of the stock at a later date on a rising market would, of course, have benefited both Schenck and defendants in that a larger amount of money could have been realized and applied in reduction of the debt. Schenck, how-

ever, wished to remove the collateral from the hands of the trustee immediately. The trustee was a partner in the law firm then representing defendants, and, in addition, he was no longer engaged in the active practice of law, having taken a wartime government position in Washington. The subject of a possible purchase of the collateral by Schenck himself at the auction sale was discussed, but both the attorney for the trustee and the new attorney for defendants, who was retained on June 24th, repeatedly raised the objection that Schenck, because of his status, was legally disabled from purchasing the collateral, directly or indirectly, and no authorization for such purchase had been granted in the settlement agreement.

On the day of the auction sale, Schenck's attorney made an oral agreement with defendants whereby the latter consented to waive the asserted legal disability of Schenck to become a purchaser of the collateral at the auction sale, in return for a promise that Schenck would credit upon the debt due him, not the amount bid by him at the auction sale, but the amount for which the stock was actually sold by Schenck at a later date on what was believed would be a rising market. Pursuant to this oral agreement, Schenck's attorney bid in the stock at the auction sale at the then market price of $19,500, and defendants made no objection to such purchase.

About a year later, Schenck's attorney denied the making of the oral agreement, demanded payment of the balance due Schenck, and then sought to enter judgment against defendants under consents to judgment executed by them at the time of the 1940 settlement agreement. Schenck's motion to direct the entry of such judgment was denied. (269 App. Div. 775.) Defendants, in October of 1943, cross-moved for an order directing Schenck and his attorneys to sell sufficient of the stock acquired at the auction sale on July 22, 1942, to satisfy the balance due under the settlement agreement and to turn over the excess to defendants. This cross motion was denied. There is evidence that by that time, the market value of the stock had risen to such an extent that a sale thereof would have produced an amount sufficient to completely liquidate the remaining indebtedness under the settlement agreement, leaving an excess of approximately $29,000 for defendants. The loss to defendants therefore within one year and three months was $158,000

if the undenied agreement of the three lawyers is to be disregarded.

Defendants then obtained leave to serve a supplemental answer (269 App. Div. 776) alleging the making of the oral agreement of July 22, 1942, and containing a counterclaim for the sum which, they contended, would have been left as excess after the payment of their debt to Schenck, if the stock had been sold in October, 1943, as demanded in the cross motion. Plaintiff, who by this time had been substituted as Schenck's executrix, subsequently served a reply setting up defenses to the counterclaim, and the case finally went to trial in September of 1949. Defendants had the burden of proof upon their counterclaim and thus they put in their proof first. At the close of defendants' case, the plaintiff rested. There was thus *no denial* of the testimony as to the agreement preceding the auction sale. The Trial Judge then directed verdict for the plaintiff and dismissed the counterclaim as matter of law; refusing to let the case go to the jury. As noted, the balance due Schenck on the date of default was $119,200. Credited to that amount, but without prejudice to defendants' rights on appeal, was the $19,500 bid at the auction sale, thus reducing the amount due to $99,700. The sum of $34,000 received upon the sale of other collateral further reduced the amount due to $65,700, for which sum, plus interest, plaintiff entered judgment. The Appellate Division, after modifying in a presently uncontested particular, affirmed the judgment below, over the dissents of two Justices who voted to reverse and order a new trial " on the ground that it was improper to grant a nonsuit upon the counterclaim." (276 App. Div. 1064, 1065.)

Upon the appeal to this court, the principal question of law argued by both parties is whether or not the transaction provided for in the 1940 settlement agreement constituted a pledge, and, if so, whether Schenck, as pledgee, was legally disabled from purchasing the collateral upon its sale after default. We think that the transaction was clearly one of pledge and that Schenck, under the settlement agreement, was legally disabled from purchasing the collateral, since authorization so to do had not been granted therein.

A pledge is a bailment of personal property for the purpose of securing the payment of a debt. (*Bank of Rochester* v. *Jones,*

4 N. Y. 497, 507, citing Story on Bailments, § 286; *Stearns* v. *Marsh,* 4 Denio 227, 229; Restatement, Security, § 1; 41 Am. Jur., Pledge and Collateral Security, § 2; 49 C. J., Pledges, § 1.) It is basically a security transaction in which, unlike a mortgage, the debtor relinquishes actual possession of his property. It is thus essential to the existence of a pledge that there be a transfer of possession by a debtor, of personal property, owned by him, to his creditor or a third person, for the purpose of securing the debt. (*McCoy* v. *American Express Co.,* 253 N. Y. 477, 482–483.)

Shares of stock in a corporation may, of course, be pledged. "In such case the transfer of the legal title being necessary to the change of possession, is entirely consistent with the pledge of the goods." (*Wilson* v. *Little,* 2 N. Y. 443, 447. See, also, Restatement, Security, § 1, comment e.)

The pledged property may be held by the pledgee so long as the debt which it was intended to secure remains unpaid. If there be a default, the pledgee may, upon notice to the debtor, sell the property and reimburse himself for the amount of the debt, returning the excess, if any, to the pledgeor. If the debt be paid by the pledgeor, he is entitled to the restoration of his security.

In the case at bar, the transaction provided for in the 1940 settlement agreement had all the attributes of, and was, a pledge. The defendants, who were concededly indebted to Schenck in the amount of $200,000, were required to give security for the payment of the debt. The installment payments upon that debt, in the words of the agreement, were to "be secured by the due and proper transfer of title and possession of collateral," such collateral being certificates representing shares of stock owned by defendants. The only purpose of the transaction was to furnish collateral security for the payment of the debt to Schenck. As the defendants paid installments on the debt and thus decreased it, portions of the collateral were required, under the agreement, to be returned to them and certain shares were so returned. The collateral was to be sold only after a default in the payment of the installments, and the proceeds of such liquidation were to be applied first, to the unpaid balance due Schenck, and the excess, if any, was to be paid to defendants. The stock certificates were constantly referred to in the agree-

ment as " collateral ". Thus, the essential nature of the transaction, without considering more than the provisions found within the four corners of the agreement, was one of pledge.

Plaintiff's argument that the transaction was not one of pledge is based solely upon the fact that the parties utilized a trustee to hold title to the stock certificates and to perform certain other duties. There is nothing inconsistent between such use of a trustee and the existence of a pledge. The trustee was no more than a pledgeholder. The parties evidently did not wish to put title to the certificates in the name of Schenck. They chose instead a trustee, who was a partner in the law firm then representing the defendants, who was designated to perform all the mechanical tasks which would otherwise have devolved upon Schenck, as pledgee. Dividends on the stock, if. any, were to be paid to defendants. Portions of the stock, as noted, were to be, and were, returned to defendants from time to time. Upon a default, a sale would have to be conducted and disposition made of the proceeds thereof. All these duties, the parties agreed, should be performed by a trustee. The trustee was, in truth, the agent of Schenck and the device was chosen for the mutual convenience of the parties. Such employment of a trustee cannot change the essential nature of the transaction which was a simple pledge.

In a similar situation, this court has recognized that a pledge may exist even though the security be held by a trustee. See *Union Ins. Co.* v. *Central Trust Co.* (157 N. Y. 633, 639) where we said: " In making the deposit, therefore, the Continental Company pledged its property for the purpose of securing payment by Dimick of any award made against him in favor of the Union and State Companies, which thereupon became the pledgees, the Continental Company the pledgor, *and the trust company the holder of the pledge in trust for the purpose aforesaid.*" (Emphasis supplied.) (See, also, 41 Am. Jur., Pledge and Collateral Security, §§ 19, 20; 49 C. J., Pledges, §§ 4, 42; Restatement, Security, § 1, comment a, p. 6; Jones on Collateral Securities, § 34, p. 42.) In 41 American Jurisprudence, Pledge and Collateral Security (§ 19), it is said: " In order to perfect the contract of pledge, the delivery need not be made to the creditor himself; it will be sufficient if the thing pledged is placed in the hands of a third person who has been

chosen by debtor and creditor to hold for the creditor, provided such third person knows of the trust and accepts the obligation which it imposes. The codes of some of the states have defined the rights and liabilities of such third person, whom it designates as the pledge holder, and have closely adhered to the provisions of the French law on this subject. Under such provisions, the pledgeor and pledgee may agree upon a third person with whom to deposit the property pledged, and if he accepts the undertaking, and receives compensation for so doing, he cannot exonerate himself.''

In section 20 it is said: '' The general rule is that the validity of a pledge is not affected by the fact that an agent or employee of the pledgeor is made the custodian of the property if the parties agree to such arrangement and he is in fact placed in possession. This rule has been frequently applied in cases where the property is allowed to remain on the premises of the pledgeor. According to some authorities, if the pledgee of goods stored on the premises of the pledgeor has and maintains actual and ostensible possession by means of a custodian and a suitable segregation and marking of the property, the custodian may not only be a person in the employ of the pledgeor but he may act without pay from the pledgee.''

One of the outstanding characteristics of a pledge is that the pledgee may not purchase the pledged property upon its sale after default unless there be express authorization so to do in the contract or unless the sale is conducted by a court of equity. This rule is firmly established by overwhelming authority. (See, e.g., *Roach* v. *Duckworth,* 95 N. Y. 391, 401–402; 41 Am. Jur., Pledge and Collateral Security, §§ 90–91; 49 C. J., Pledges, § 265; Restatement, Security, § 51; Jones on Collateral Securities, § 635; Van Zile on Bailments and Carriers, § 305; Note, 38 Col. L. Rev. 923, 924–925; 76 A. L. R. 705, 708; 109 A. L. R. 1106, 1107; *Gins* v. *Mauser Plumbing Supply Co.,* 148 F. 2d 974, 979–980, and cases cited.) Compare *General Phoenix Corp.* v. *Cabot* (300 N. Y. 87, 94), and *Sager* v. *Friedman* (270 N. Y. 472, 477), where consent to the purchase by the pledgee was expressly given under the contract. The reason for this rule is simple and obvious. As we said in *Toplitz* v. *Bauer* (161 N. Y. 325, 332): '' The contract of bailment, whereby personal property is deposited or pledged as security for a debt, creates duties and relations

peculiar to itself. These duties and relations are governed more by the general maxims of equity than by the strict rules of the common law. It has been said that the pledgee occupies the position of a trustee for the owner, to pay the debt first, and then the surplus over to the pledgor. He is not permitted to deal with the trust property in such a way as to destroy or impair its value. (*Gillet* v. *Bank of America,* 160 N. Y. 560.) It is quite certain that the law imposes duties upon the pledgee quite analogous to those existing in all trust relations.'' Thus, the law, for the protection of the pledgeor, absolutely forbids the pledgee to purchase the pledged property without the express consent of the pledgeor. This is so, regardless of any question as to the fairness of the sale or the adequacy of the consideration, because the pledgee, by virtue of his position, has too great an opportunity to abuse the fiduciary relationship between himself and the pledgeor and to benefit himself at the expense of the pledgeor. The principle that a pledgee cannot be a purchaser at a sale of the pledged property is so firmly established that it must be deemed to have been within the contemplation of parties entering into a pledge transaction, where no provision to the contrary was made. Nowhere in the 1940 settlement agreement, which was drawn by lawyers and reduced to writing after negotiations, was Schenck granted the right of purchase upon liquidation of the collateral.

The case of *Easton* v. *German-American Bank* (127 U. S. 532) which is largely and almost exclusively relied upon by plaintiff, was concerned with an essentially dissimilar transaction. In that case *, the United States Supreme Court decided that a

---

* The facts of the *Easton* case are somewhat complicated, and, for convenience, we state them here. Bowen Bros. issued a series of 100 bonds, payment of which was secured by a deed of trust conveying to one Smith certain real estate owned by Bowen Bros. and empowering him to sell the real estate to the highest bidder, upon the application of any of the bondholders. Forty of those 100 bonds were pledged by Bowen Bros. with the German-American Bank as security for a loan. The real estate which secured the payment of the bonds was sold upon the application of one of the bondholders, not, however, the German-American Bank. One Dexter purchased the land at the sale acting as the agent for all the bondholders. Afterwards, he conveyed 40/100's of the land to the German-American Bank, which, as noted, held that proportion of the bonds. Later the bank sold the land to one Dore, and also

banking corporation, which held certain bonds as security for a loan, could, with all the other bondholders, purchase and acquire title to certain *real property* which had been conveyed to a trustee by the obligor on the bonds as security therefor under a *deed of trust mortgage.* The court noted that (p. 538) : " The relation of a creditor secured by such a deed of trust to a sale made under a power given to a stranger as trustee does not differ from that of a mortgagee of real estate sold under judicial proceedings for foreclosure by a decree of a court of equity. At such a sale nothing is more common than for the mortgagee to become the purchaser; * * *." The transaction in the *Easton* case (*supra*) involved the use of a trust mortgage of realty as an instrument of finance. Compare, for example, the present statutory provisions existing in this State for such a case. (Real Property Law, §§ 119–123.)

The *Easton* case (*supra*) was cited by us in *Morris* v. *Windsor Trust Co.* (213 N. Y. 27, 31, Cardozo, J.), where we said: " * * * This court has many times held that a contract of pledge creates a fiduciary relation between the pledgeor and the

---

passed title to the 40 bonds to him. Meanwhile, Bowen Bros. had been adjudicated bankrupts. The assignee in bankruptcy sold to one Easton, for the sum of $5, any claim that Bowen Bros. might have against the bank with reference to the bonds deposited as collateral. Easton sued the bank claiming that it had held the bonds as pledgee, that the deed of trust to Smith was a mere incident of the pledge, that, without specific authorization so to do, the bank was unable to participate in the purchase of the real estate by all the bondholders, that in attempting so to do, it acquired the real estate as pledgee for the debtor, Bowen Bros., and that Easton, the assignee of Bowen Bros.' rights, was entitled to a portion of the money realized upon the bank's subsequent sale to Dore. Easton's action was dismissed in the lower Federal courts, and the Supreme Court affirmed. It pointed out that the 40 bonds held by the bank, as pledgee, had not been sold to Dore, either in point of fact or of law, but that they had merely been delivered to him " as muniments of title in connection with his purchase of the real estate." Moreover, the court noted, the bonds were worthless at the time of the sale to Dore since the obligors thereon, Bowen Bros., had by then been adjudicated bankrupts. The court further stated that Easton's right against the bank to a portion of the money received for the real estate acquired by it depended upon " whether the principles of a pledge, and of a trust arising thereon, apply to the *real estate* conveyed by the Bowens to Smith as a trustee *to secure the payment of the bonds.*" (P. 537, emphasis supplied.) The court thought not, and decided that in the case of such a *deed of trust to real estate,* the creditor might purchase at a sale thereof. See quotation from page 538 in the text, page 155.

pledgee. (*Toplitz* v. *Bauer,* 161 N. Y. 325, 332; *Gillet* v. *Bank of America,* 160 N. Y. 549, 560; *Wheeler* v. *Newbould,* 16 N. Y. 392, 398.) In so holding, its decisions have been in harmony with those of the Supreme Court of the United States. (*Easton* v. *German Am. Bank,* 127 U. S. 532, 536; *Pauly* v. *State Loan & Trust Co.,* 165 U. S. 606, 618, 620.) * * *.'' As the context shows, the *Easton* case was cited for the familiar proposition — noted above at pages 153–154 where we have quoted from the *Toplitz* case (*supra*) — that a contract of pledge creates a fiduciary relation between the pledgeor and the pledgee. That is even more apparent after examination of the accompanying citation of *Pauly* v. *State Loan & Trust Co.* (165 U. S. 606, 618, 620) because in the *Pauly* case, the Supreme Court, at page 618, quoted the portion from the *Easton* case which points out that '' In reference to the pledge and to the pledgor, he [the pledgee] occupies a fiduciary relation, by virtue of which it becomes his duty to exercise his right of sale for the benefit of the pledgor.'' A similar statement was made by the court in the *Pauly* case, at page 620. We were careful to cite the exact page numbers at which the language to which we made reference appeared, viz., page 536 of the *Easton* case and pages 618 and 620 of the *Pauly* case. We have always been quick to recognize a fiduciary relation, and firm in our protection of the special rights created thereby, refusing to limit it to, or bound it by, classified transactions. This in our State is a matter of public policy which should be strengthened rather than weakened. See, for example, the opinions in *Wendt* v. *Fischer* (243 N. Y. 439, 443, 444, CARDOZO, J.); *Meinhard* v. *Salmon* (249 N. Y. 458, 464, CARDOZO, Ch. J.); *Marcellus* v. *First Trust & Deposit Co.* (291 N. Y. 372, 374, LEHMAN, Ch. J.); *City Bank Farmers Trust Co.* v. *Cannon,* (291 N. Y. 125, 131, 132, THACHER, J.); *Matter of Durston,* (297 N. Y. 64, 71, 72, THACHER, J.) and *Matter of Ryan* (291 N. Y. 376, 399) where we pointed out '' * * * this court has never deviated but has preserved the ' rule of undivided loyalty ' against the ' disintegrating erosion ' of particular exceptions '', citing the *Wendt* and *Meinhard* cases (*supra*). We think the respondent here seeks to make a particular exception in the face of the *undenied* agreement by the lawyers representing the only three interested parties: Schenck, the pledgeholder and the defendants.

We hold, therefore, that Schenck, as pledgee, was legally disabled from purchasing the pledged collateral upon any sale thereof after default. That disability was specifically waived by defendants in order to permit Schenck to remove the stock from the hands of the trustee and to hold it himself as pledgee, under the oral agreement, so that the actual amount received for the stock on a subsequent sale might be credited upon defendants' debt.

While no opinions were written below, it appears that the dismissal of the counterclaim by the Trial Judge was based upon one or more of the legal objections raised by plaintiff to the validity of the oral agreement. We, however, are unable to agree that those objections, or any of them, constitute a conclusive defense to the counterclaim as matter of law.

The oral agreement certainly did not lack consideration on the part of defendants. The waiver of Schenck's legal disability to purchase constituted ample consideration for Schenck's promise. (*Ryerson & Son, Inc.,* v. *O'Donnell, Inc.,* 279 N. Y. 109, 115.) Neither was the agreement so indefinite and uncertain as to be unenforcible. There was no need under our authorities to specify any period of time within which Schenck was to sell the stock or the price at which he was to sell it. Schenck, the jury might find, was to hold the stock as pledgee, subject to the conditions generally applied to pledgees by implication of law. Plaintiff pleaded in her reply that the agreement was violative of the Statute of Frauds in that it was not to be performed within one year (Personal Property Law, § 31, subd. 1). That was plaintiff's only defense under that statute. Apparently, in this court, plaintiff has abandoned that defense and, without amending her reply, is urging that the agreement violates subdivision 8 of section 31, viz., that the agreement was one to establish a trust. Since a jury may find, as we have indicated above, that Schenck, under the agreement, was to hold the stock as pledgee subject to the conditions generally applied to pledgees by implication of law, plaintiff's present contention, even if pleaded, would be untenable and inapplicable. Moreover, even if we were to concede, as plaintiff now urges, without pleading it, that the purpose of the oral agreement was to make Schenck a trustee for the benefit of defendants the objection is not sufficient as matter of law, for

the jury might find that the trust, if any, was created simultaneously with the making of the oral agreement and hence that the agreement was not a " contract to establish a trust " but rather a parol declaration of trust not within the statute. (*Blanco* v. *Velez,* 295 N. Y. 224, 226; *Hirsh* v. *Auer,* 146 N. Y. 13.) Nor does rule 4 of the Rules of Civil Practice constitute a defense as matter of law. We think the agreement does not come within the coverage of rule 4 since it did not directly relate to the action brought by Schenck against the defendants. That action had been settled in writing in 1940. The 1942 agreement related to the permissible conduct of the parties under the settlement agreement. But even if that were not so, Schenck by purchasing at the sale availed himself of the oral waiver given by defendants, and having so acted, he cannot now be heard to assert that the agreement under which he so acted is not binding. (*People* v. *Stephens,* 52 N. Y. 306, 310; *Zwecker* v. *Levine,* 135 App. Div. 432, 434; *Lloyd* v. *R. S. M. Corp.,* 225 App. Div. 85, 89.) Finally, we think it clear that the question of the actual or apparent authority of Schenck's attorney to enter into the agreement on his behalf was, on all the evidence in the case, one of fact for the jury. (*Hedeman* v. *Fairbanks, Morse & Co.,* 286 N. Y. 240, 248–249, *supra.*) Prior to the making of the agreement, Schenck had executed an *irrevocable power of attorney* in favor of the attorney for the purposes of his action against the defendants. It was therein stated that the attorney had a beneficial interest in the litigation and that he was authorized, in Schenck's name, " but for the sole use and benefit " of the said attorney to collect the debt from the defendants. In the settlement agreement of 1940, signed by Schenck, it was provided that " All notices and directions required to be given by Schenck shall be given by [the attorney and his partner] with the same force and effect as though given by Schenck." There is no showing of any limitation by Schenck of such authority to act for him in all matters pertaining to the litigation with the defendants. Schenck never appeared in the negotiations and conferences and defendants' request for a personal meeting with Schenck to discuss the matter was refused by Schenck's attorney.

Thus, on the question of the validity of the oral agreement of July 22, 1942, the courts below erred in attempting to decide

the issues thereby raised in plaintiff's favor *as matter of law,* and, consequently, there must be a new trial. On such new trial, the primary issues for the jury, of course, will be the existence and meaning of the oral agreement. If the jury find that the agreement was made and that thereunder, Schenck, in return for defendants' waiver of his disability to purchase, was to credit upon the debt the amount realized when he subsequently sold the stock, then, as we have indicated above, the first four of the five legal objections interposed by plaintiff to the validity of the agreement, are untenable. The fifth objection, that of lack of authority on the part of Schenck's attorney, would remain one of fact for the jury. But even if the jury, as matter of fact, should find that Schenck's attorney had neither actual nor apparent authority to make the agreement on Schenck's behalf, and that, for that reason, the agreement was not binding upon Schenck, then the waiver of Schenck's disability, which was given by defendants as part of the agreement was also without effect and Schenck's purchase of the stock at the auction sale was without legal sanction, for a court of equity will not permit Schenck or his estate to accept the benefit of that waiver while refusing performance under the agreement.

If the purchase by the pledgee be deemed unauthorized for that reason, the law is clear that the pledgeor has the option either to affirm or reject the purported sale. The sale in such a case is not void but voidable only, at the election of the pledgeor. (*Roach* v. *Duckworth,* 95 N. Y., *supra,* p. 401.) If the pledgeor elects to treat the sale as illegal, " the parties are remitted to their rights the same as though no sale had been attempted " (*Bryan* v. *Baldwin,* 52 N. Y. 232, 235) and the pledgee still holds the property as pledgee, with all the duties and obligations of that status. (*Duncomb* v. *New York H. & N. R. R. Co.,* 84 N. Y. 190, 204–205; *Jones* v. *National Chautauqua County Bank,* 272 App. Div. 521, 527, McCURN, J.) As stated in the Restatement of Security, section 51, comment a, " The pledgor has the option of affirming the sale and holding the pledgee accountable for the purchase price, or of disaffirming the sale. If he takes the latter alternative, the pledge is not terminated."

Under either theory, Schenck, after July 22, 1942, was in the position of a pledgee with respect to the oil stock. If the oral

agreement of July 22, 1942, was valid, then the purchase by Schenck at the auction sale was proper, it having been authorized by the defendants, and Schenck, under the oral agreement, was required to credit upon the debt of the defendants the amount actually received upon a subsequent sale of the stock by him, viz., the same duty any pledgee holding collateral would have. If the oral agreement of July 22, 1942, was not binding upon Schenck because of lack of authority in his attorney who made it and the authorization given by defendants thus fell with it, then the purchase by Schenck, was improper, and under the law as stated above, the parties were remitted to their rights the same as though no sale had been attempted and Schenck continued to hold the stock as pledgee. In either event, the defendants would be entitled to be credited on their debt, not with the amount bid by Schenck at the auction sale, but with the amount which the collateral sold for when Schenck liquidated it, or should have liquidated it.

It appears in the record that Schenck or his estate disposed of the oil stock " within two years " after he acquired it at the auction sale on July 22, 1942. It does not appear, however, how much money was realized upon such subsequent sale. It also appears, as already noted, that defendants in October of 1943, cross-moved for an order compelling Schenck and his attorneys to sell sufficient of the oil stock to satisfy the balance due Schenck and to turn over the excess to defendants.

Defendants claim that that cross motion constituted a demand by them that Schenck liquidate the collateral at that time, and that by failing so to do, Schenck became liable for the then market value of the stock, which was sufficient to pay off the balance of the debt and to leave an excess for defendants of approximately $29,000.

It is generally held that, even after a default in payment on the part of the pledgeor, the pledgee is under no obligation to sell the collateral, but may sell it or not at his option. (*Howell* v. *Dimock,* 15 App. Div. 102, 104; *First Trust & Deposit Co.* v. *Potter,* 155 Misc. 106, 111; cases cited in 77 A. L. R. 379; Restatement, Security, § 52.) Where, however, after default, the collateral security is sufficient to satisfy the debt, including interest, expenses and cost of sale, and the pledgeor requests or directs the pledgee to sell the collateral, the pledgee's duty of good

faith towards the pledgeor does not justify a refusal, and if he refuses, he may be held liable for any resulting loss. (See Restatement, Security, § 52, comment a.)

Defendants' cross motion in October of 1943, did contain such a request or demand that the securities be sold, and the evidence in the record shows that the securities at that time would have been more than sufficient to satisfy the debt. That cross motion, however, was denied by Special Term and no appeal was taken therefrom by defendants. Since the demand was couched in the form of a motion, and since the motion was denied by the court, we are inclined to think that plaintiff was justified in relying upon the decision of the court, despite the general rule, above stated.

Defendants' rights, in our judgment, must be determined as of the time when Schenck or his estate actually sold the pledged collateral. The proceeds of such sale should be applied first, upon the debt due Schenck, and the excess, if any, should be returned to defendants. We do not know the amount realized upon that subsequent sale by Schenck or his estate. That issue and all other factual issues in the case may be determined on a new trial.

The judgments below should be reversed and a new trial ordered, with costs to defendants in all courts to abide the event.

LOUGHRAN, Ch. J., DYE and FULD, JJ., concur with DESMOND, J.; CONWAY, J., dissents in opinion in which LEWIS and FROESSEL, JJ., concur.

Judgment affirmed. [See 302 N. Y. 703.]

